[S. F. No. 22624. In Bank. May 16, 1969.]

LOU ASHE et al., Petitioners, v. THE STATE BAR OF CALIFORNIA, Respondent.

Herman F. Selvin, Frederick A. Cone and Belli, Ashe, Ellison, Choulos, Cone & Harper for Petitioners.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—This is a proceeding to review a recommendation of a disciplinary board of the State Bar that petitioners be suspended from the practice of law for six months for professional misconduct in violation of their oaths and duties as attorneys and counselors (Bus. & Prof. Code, §§ 6067, 6068, 6103) and wilfully violating rule 2, section a(1) and (2), and rule 3 of the Rules of Professional Conduct.[1]

The accusation against petitioners is that they indirectly solicited professional employment through their salaried

---

[1]Rule 2, section a. "A member of the State Bar shall not solicit professional employment by advertisement or otherwise.

"Without limiting the generality of the foregoing a member of the State Bar shall not solicit professional employment by

"(1) Volunteering counsel or advice except where ties of blood relationship or trust make it appropriate.

"(2) Using a newspaper, magazine, radio, television, books, circulars, pamphlets, or any medium of communication, whether or not for compensation, to advertise the name of the lawyer or his law firm or the fact that he is a member of the State Bar or the bar of any jurisdiction; nothing herein shall be deemed to prevent the publication in a customary and appropriate manner of articles, books, treatises or other writing."

Rule 3. "A member of the State Bar shall not employ another to solicit or obtain, or remunerate another for soliciting or obtaining, professional employment for him; nor, except with a person licensed to practice law, shall he directly or indirectly share compensation arising out of or incidental to professional employment; nor shall he directly or indirectly aid or abet any person not so licensed, or any association or corporation, to practice law or to receive compensation therefrom. A member of the State Bar shall not knowingly accept professional employment offered to him as a result of or as an incident to the activities of any person not so licensed or of any association or corporation that for compensation controls, directs or influences such employment, except from an insurer whose financial interest in the subject matter renders such employment necessary and proper for the protection of such financial interest or from a person or party, who, by reason of guaranty or endorsement, has a direct financial interest in the subject matter of such employment, and who, because of such direct financial interest is permitted to participate in or control the subject matter of such employment."

investigator, Harold McGlenon, and ratified acts of solicitation by him. Extensive hearings were conducted, and after the local administrative committee recommended six months' suspensions, the disciplinary board referred the case back in order that petitioners might present evidence as to their state of mind as bearing on the issue of whether either of them ratified any acts of solicitation. Eight members of the disciplinary board recommended to this court that petitioners be suspended for six months; five members of the board declined to recommend any discipline on the ground that violations of the State Bar Act or Rules of Professional Conduct had not been proved.

Petitioners are partners; petitioner Ashe was admitted to practice in this state on May 7, 1947; petitioner Gerry on December 19, 1956. Neither has been the subject of previous disciplinary action.

The inquiry into petitioners' conduct was initiated by a State Bar staff attorney as a result of letters received from several members of the Bar bringing attention to newspaper items reporting the filing of complaints by petitioners on behalf of persons injured in a plane crash. None of the persons allegedly solicited complained to the State Bar.

On October 29, 1960, a commercial airplane carrying members of the California Polytechnic College football team, coaches, and team boosters crashed on takeoff from the Toledo, Ohio, airport, killing some of the passengers and severely injuring many others. One of the less-severely injured players, Carl Bowser, was released from a Toledo hospital about a week later and returned to Bakersfield, California. John S. Thompson, who lived in the Bay Area, was a friend of Bowser and his teammates. He went to Bakersfield to attend the funerals of some of the players with Bowser. Mr. Thompson spent several days in Bakersfield, and during that time Bowser asked him to recommend an attorney to represent himself and his injured teammates. Mr. Thompson recommended Mr. Belli.[2] Mr. Bowser tried to reach Mr. Belli by telephone but was unable to do so, and he asked Thompson to contact him on his return to San Francisco. Thompson arranged a meeting with petitioners, Ashe and Gerry, and from their office Thompson telephoned Bowser in Bakersfield, who spoke with petitioners on a conference call. At Bowser's

[2]Mr. Belli is not a party to this proceeding, but because many of the witnesses refer to the firm name of Belli, Ashe & Gerry, it is impossible to eliminate his name.

request, Mr. Harold McGlenon, an investigator employed by petitioners, was sent to Bakersfield to interview Bowser and Robert Johnson, a teammate who had returned to Bakersfield after the meeting between Bowser and Thompson. Bowser and Johnson signed contracts retaining petitioners' firm.

Before leaving Toledo, Bowser told Bill Ross, an injured and badly burned teammate, that he would see about getting a lawyer when he got home. Ross told Bowser that if he was going to get an attorney to get one for him also. Bowser telephoned Ross in Toledo, telling him that he had made arrangements for an attorney, and Ross requested Bowser to send him to Toledo to see him.

Robert Johnson was ambulatory while in the Toledo hospital and was in the same ward with Roger Kelly, Russell Woods and Don Adams. He talked with them about hiring a lawyer to represent all of the people injured in the crash, suggesting to them that they "stick together" and hire one lawyer because they didn't have any money. He also talked with Albert Marinai, Bill Ross, Gilbert Stork, Walter Shimek, William Dauphin, and Mr. Nettleship, the sports editor of a San Luis Obispo newspaper who had accompanied the team. Mr. Nettleship said he would "go along" with the others.

Mr. Johnson further told McGlenon he would arrange a group meeting of other injured players who had returned to school and asked him to have someone from petitioners' office come to San Luis Obispo to talk with them. Shortly thereafter, at the request of Ted Tollner, a member of the football team, petitioner Ashe met with a group of boys whom Tollner had invited to his home to meet with Mr. Ashe. A number of those players employed petitioners' firm to represent them. The only acts of solicitation charged are those alleged to have been made by McGlenon in Toledo. When McGlenon returned from Toledo he reported orally and in writing to petitioners. His written report was admitted in evidence. The disciplinary board found that McGlenon "asked and advised" the following persons to employ petitioners to represent them: Albert Marinai, then a minor; his parents, Ralph and Anne Marinai; Gilbert Stork; Roger Kelly; Russell Woods; Mrs. Shimek, the mother of Walter Shimek; and John Nettleship. The State Bar in its brief now concedes that the evidence may be insufficient to sustain the finding that Mr. Nettleship was solicited. The evidence bearing on McGlenon's contacts with the remaining persons allegedly solicited is set out below.

1. Albert Marinai, a minor at the time of the crash, was

severely injured and was under constant care from October 29, 1960, until March of the following year. He believed he was under heavy sedation for the first month. He testified that McGlenon had not come to visit him at his request. McGlenon introduced himself by name, said he was an investigator for the Belli firm, and left his business card. He did not remember whether McGlenon asked if he had an attorney, but they discussed the accident and his condition. He did not remember talking about the weather conditions the night of the crash, the condition of the airplane, or what happened during takeoff. He said McGlenon spent about 10 minutes with him and left with him a book entitled Ready for the Plaintiff, by Mr. Belli, and told him to read it.

Ralph Marinai, Jr., Albert's brother, went to Toledo about two weeks after the crash. He saw Ready for the Plaintiff in his brother's room but did not know how it got there. He had seen an unidentified man in the hospital corridor carrying two or three books but did not know what the books were except that the white paper covers were the same as the cover of the book in his brother's room.

Mr. McGlenon denied he had given Albert the book. He testified that he took only two books with him, one for Bill Ross and one for attorney Friedman, a friend of petitioner Ashe.

McGlenon's written report to petitioner Ashe after his return from Toledo states: "The San Francisco boy, Al Marinai, his father and mother and brother were present, and they were going to postpone for sometime in the future the employment of counsel . . . this boy is in pretty bad shape, both arms in casts, and both legs in casts, and the determination of whether or not to cut off his left leg is being postponed day to day. There has been some recovery there. . . ."

2. Ralph and Anne Marinai, Albert's parents, were not called as witnesses. The only evidence of any contact with them came from McGlenon's above-quoted written report, his testimony that they were in the room when he talked with Albert, and Albert's testimony that he did not hear what McGlenon discussed with his parents.

3. It was stipulated that Gilbert Stork would, if called as a witness, testify in accordance with his signed statement: ". . . about two weeks after the accident, a Mr. Harold McGlenon, who said he was an Investigator for the law firm of Belli, Ashe & Gerry of San Francisco, came into my hospital room. McGlenon asked if I had engaged an attorney as yet. As I knew my folks were taking action to engage an attorney, I

do not recall what else was said. However, McGlenon left his card with me. I have initialled this card for identification and it is herewith.''

Mr. McGlenon's written report reads: ''. . . Gill Stork informed me that he was going to engage Mr. James. Boccardo of San Jose as his attorney. . . .'' McGlenon testified that Stork told him that he had engaged Mr. Boccardo, that he told Stork that Mr. Boccardo was a fine attorney, and that he gave Stork his card to give to Mr. Boccardo.

4. Roger B. Kelly testified that he did not know that McGlenon was coming to see him; that he had not requested anyone ''to arrange'' an attorney for him; and that he did not recall either Bowser or Johnson having discussed the subject of counsel with him before they left Toledo. Kelly suffered a broken back in the crash and was under medication for pain throughout his stay at the hospital for approximately three weeks. He testified that the discussions he had during the first ten days after the accident were pretty vague. He could not recall exactly what McGlenon first said to him, but he remembered that McGlenon said he was an investigator for Belli, Ashe & Gerry, who were ''available if I would like them to be.'' He was not sure whether there was any conversation with McGlenon as to how the plane crash occurred.

On cross-examination he couldn't say exactly and couldn't recall that McGlenon had used the word ''available,'' but something McGlenon said indicated that the firm was available to him as an attorney. He was asked when he determined that McGlenon had indicated the firm was available. He replied: ''The first day, and then the day I got a book that they asked me to look through, that Ramona Ross had brought down to me. . . . Q. Billy Ross's wife? A. Right. Q. Showed you a book? A. Brought a book down, and in the proceeding [sic] conversation it seemed that Mr. McGlenon had left it with her so she could show it to me. Q. Did she tell you that? A. Yes. Q. When was that? A. A couple of days later. I'm not exactly sure.'' Kelly's testimony in this regard was contradicted by Mrs. Ross, who testified that she did not take the book to Kelly and McGlenon had not told her to do so.

Mr. Kelly had been interviewed by a State Bar investigator on January 18, 1961, at which time he told him he had not been solicited by any attorney or representatives of any attorney in connection with injuries received in the crash. To explain the inconsistency between his testimony at the hearing and his earlier statement, he said he thought the inquiry by

the State Bar investigator related only to solicitation by his own attorney.

Mr. Kelly did not recall whether he told McGlenon he was going to employ Morris Chain as his lawyer, but he did tell him he was going to contact Mr. Chain. He did not remember whether McGlenon told him to have Mr. Chain contact McGlenon for investigative purposes. He recalled having told a State Bar investigator that he had possessed for a time one of McGlenon's cards but didn't recall receiving it, and he didn't recall whether McGlenon had told him to give the card to Mr. Chain.

Mr. McGlenon's written report reads: "Roger Kelly in Room 428 informed me that he had Mr. Chain, who is a friend of yours [petitioner Ashe] in Bakersfield as his attorney." McGlenon testified that he gave Kelly his card and told him to have his lawyer contact petitioners' firm for the purpose of cooperating in the investigation of the crash.

5. Russell Woods was not called to testify. McGlenon's written report states: "I interviewed Russ Woods, whose father I had spoken to previously in Gridley. He doesn't have any marks on his body except his right eye was very bloodshot, but whether he suffered a concussion, or the shock of the accident, something has affected him mentally, but in my conversations with him, he was keen and alert, and understood the whole problem, and said to me that he would also postpone the employment of an attorney until he came back to Cal Poly which will be within several days—he has improved so greatly."

6. Mrs. Shimek, who lived in Canada, did not testify. McGlenon's report of his interview with Mrs. Shimek and an unnamed Lutheran minister in Toledo reads: "The young man, Walt Shimek, is impossible to interview. He had received brain damage, and the doctor, nurses, and also his mother felt that excitement might set him back. Within the last several days he had improved so greatly that they were looking forward to a complete recovery. He is not a minor. He is of age. I had a long conversation with his mother. She is of Polish extraction from Alberta, Canada, and is so upset that she just couldn't consider employing an attorney—she doesn't know how to do it—she further said: 'I hope my son will be recovered within a week. He will have to make his own decision on this subject.'

"I then interviewed a Lutheran minister, from the Bowling Green School, which is a Lutheran college. We had a long conversation in the lobby of the Toledo Hospital. He knew of

Mr. Belli, he knew of his ability, and he agreed with me that Mr. Belli certainly should be the one person in the United States to handle Mr. Shimek's case. He further agreed with me that on his next interview with Mrs. Shimek he would prevail upon her to join with the rest of the boys in employing this office as counsel.''

Mr. McGlenon testified that he followed a regular pattern in his interviews. He introduced himself, asked if the person were injured, how he was feeling, how many hours the plane had been in the air, whether it was foggy, and whether anyone had any information about the pilots' drinking. He learned that someone from the school administration had instructed the boys not to talk with anyone from attorney's offices, and he testified that the boys were reticent and knew nothing about the cause of the crash but did discuss their injuries with him. He spent part of his time, three days, in Toledo with Mr. Friedman, an attorney friend of petitioner Ashe, who recommended a commercial photographer. He obtained Toledo newspapers and negatives of photographs taken the night of the crash, and interviewed the Toledo airport commissioner. He learned that the plane motors had been taken to Washington, D.C. and were in the possession of Federal aviation authorities there. Other wreckage had been removed from the airport runway to a junkyard.

Petitioner Gerry instructed McGlenon to contact everybody aboard the aircraft for the purpose of getting statements from them as to the happening of the accident; to contact the tower; to have someone take pictures of any wreckage left on the field; to obtain all the photographs he could from newspapers; to contact any eyewitnesses; provided the C.A.B. people were still in Toledo, to determine whether his firm could participate in the actual investigation of the crash; and to ascertain from the coroner's office whether an autopsy had been performed on the pilot or copilot and, if so, to obtain a copy of the report. He was interested in the autopsy because Johnson had said one of the pilots had been drinking before takeoff.

Petitioner Gerry further instructed McGlenon to see Ross and Nettleship and get retainer contracts and signed authorizations from them and to contact all passengers who Bowser and Johnson said wanted to retain the same counsel. Contracts were not given McGlenon for anyone else because Bowser and Johnson had not been as definite about the others. Petitioner Gerry told McGlenon that if others wanted to

retain the firm "he should put them in touch with the office; or if they wanted, one of us from the office would call them and discuss with them the possibility of retaining us as counsel." Petitioner Gerry had been told by Bowser and Johnson that a number of the football players in Toledo, as well as some who had returned to California, wished to retain petitioners' firm. He did not instruct McGlenon to take any of Mr. Belli's books to Toledo and did not know that he had done so.

Petitioner Gerry testified that McGlenon telephoned from Toledo to report that he was having difficulty interviewing players because of instructions given by someone connected with the school. He advised McGlenon to continue his efforts. Prior to the time McGlenon returned from Toledo, petitioners' firm represented seven injured passengers, none of whom (except Ross) was in Toledo at the time McGlenon was there.

Of the cases petitioners were originally charged with soliciting only two, Ross and Nettleship, came directly to petitioners' firm. Neither the local administrative committee nor the disciplinary board found that Ross was solicited, and, as heretofore mentioned, the State Bar in its brief concedes that the evidence may be insufficient to prove that Nettleship was solicited. Petitioner Gerry testified that the case of Albert Marinai was forwarded to his firm by attorney Walter McGovern; Robert Ford of Los Angeles associated petitioners' firm in the Russell Woods case; Gilbert Stork's case came to petitioners through association with Mr. Somogyi, an attorney in San Luis Obispo; and in Walter Shimek's case petitioners' firm was associated by the Pelletreau office. Petitioners never represented Ralph or Anne Marinai (Albert's parents). Roger Kelly was never petitioners' client and, with the exception of a "package deal" settlement that petitioner Gerry negotiated with attorneys representing the insurers of the aircraft, petitioners did not represent Kelly and received no fee from him.

Petitioner Ashe testified that there was a division of duties between petitioner Gerry and himself. He was to review the applicable law and prepare the pleadings; petitioner Gerry was to do the investigation and prepare the cases for trial, with the two collaborating from time to time. He left the instructions as to the investigation to his partner. Petitioner Ashe told McGlenon to see an old friend of his, attorney Marcus Friedman, who might be of assistance in his investiga-

tion. He did not instruct McGlenon to take a copy of Mr. Belli's book to Mr. Friedman.

The only questions necessary for our determination are whether McGlenon's acts constituted solicitation that petitioners ratified and whether petitioners wilfully employed him to solicit professional employment for them.

■ In disciplinary proceedings, findings of fact made by the local administrative committee and the disciplinary board of the State Bar, while given great weight, are not binding on this court, and we will weigh the evidence and pass upon its sufficiency. ■ The burden is on petitioners to demonstrate that the findings are not supported by the evidence or that the recommendations are erroneous or unlawful. In meeting this burden, petitioners must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty. ■ In making our determination, all doubts should be resolved in favor of the accused, and if two or more equally reasonable inferences may be drawn from a proved fact, the inference leading to the conclusion of innocence rather than the one leading to the conclusion of guilt will be accepted. (*Steiner* v. *State Bar*, 68 Cal.2d 707, 708-709 [1-3] [68 Cal.Rptr. 729, 441 P.2d 289] ; *Most* v. *State Bar*, 67 Cal.2d 589, 596 [2a-3] [63 Cal.Rptr. 265, 432 P.2d 953] ; *Zitny* v. *State Bar*, 64 Cal.2d 787, 789-790 [1-3] [51 Cal.Rptr. 825, 415 P.2d 521].)

■ It is petitioners' position that McGlenon's trip was primarily investigative and, in addition, they were justified in relying upon information received from Bowser and Johnson that injured passengers other than Ross and Nettleship wanted to retain the same attorneys as Bowser and Johnson had employed. The State Bar finds no impropriety in petitioners' investigative activities, including interviewing injured witnesses who might be potential claimants, but it contends that it is apparent from McGlenon's written report that he was sent on a mission to obtain clients and that his report is a ''progress report on the possibilities of obtaining clients in addition to Ross and Nettleship.'' This contention, it is claimed, is supported not only by the wording of his report but by the absence of any reference to discussions with the injured players as to the facts of the accident.

That the report contains no information about the facts of the crash is sufficiently explained in the report itself: ''I interviewed all the boys who were still in the hospital, but they had been instructed apparently by Mr. Kennedy, the vice

president, of Cal Poly not to make any contacts or agreements, or give any statements to any representatives of lawyers or lawyers, so I had no success." The State Bar interprets the clause, "so I had no success," to mean that McGlenon was reporting to his employers that he had no success in obtaining agreements to hire them. An equally reasonable inference is that he had no success in getting any statements from the passengers on the facts of the crash. Petitioner Gerry was asked his state of mind when he read the above-quoted passage and he testified: "It was my opinion that, on reading this paragraph, Mr. McGlenon had done as I instructed him. He had attempted to get statements from all of the witnesses to the accident, including the boys who were still in the hospital, and he had been unsuccessful in doing so because of the actions of one of the officials of the Cal Polytechnic State College. It was my opinion that in no way did that paragraph reflect that Mr. McGlenon had gone outside of my instructions to him and solicited on my behalf or anyone else's behalf representation as counsel of these boys."

The facts that distinguish this case from the usual "ambulance chasing" case where an attorney or lay intermediary, without having been requested by anyone to do so, calls on accident victims whom he does not know and who are neither clients nor former clients (e.g., *Honoroff* v. *State Bar,* 50 Cal. 2d 202 [323 P.2d 1003]; *Mitton* v. *State Bar,* 49 Cal.2d 686 [321 P.2d 13]; *Tonini* v. *State Bar,* 46 Cal.2d 491 [297 P.2d 1]) are that petitioners had established clients who were involved in a common accident and their clients had requested them to send someone from their office to Toledo to see other prospective clients. Whether any of the persons allegedly solicited knew McGlenon or petitioners, and had not requested McGlenon to contact them, is unimportant so far as concerns McGlenon's calling on them. Petitioners had been retained by Bowser and Johnson, and orally by Ross, before McGlenon went to Toledo. Petitioner Gerry and two experienced lawyer-witnesses from San Francisco firms engaged in personal injury litigation testified that custom and usage in investigating multiple-claimant accidents included contacting all persons having relevant information; these persons might be potential plaintiffs, unrepresented by counsel; if the investigation disclosed that an accident victim was represented by counsel, the investigator would procure counsel's name and report it to his employer, who would contact the attorney for the purpose of collaborating and sharing investigative data; and it was customary for attorneys to form a committee to

cooperate in the development of evidence in the case. It was not improper for McGlenon to ask those he interviewed whether they were represented by counsel and, if so, to obtain their names and to leave his business card containing his and his employers' names. He reported that the Marinais and Russell Woods were going to postpone employment of counsel; that Gilbert Stork informed him that he was going to engage Mr. Boccardo; that Kelly was going to contact Morris Chain; and that Mrs. Shimek said her son would have to make his own decision. While from the foregoing it might be inferred that McGlenon asked that his employers be retained, an equally reasonable inference is that the responses were obtained as part of standard practice among investigators.[3] In resolving conflicting inferences, the one most favorable to petitioners must be adopted. (*Zitny* v. *State Bar, supra,* 64 Cal.2d 787, 790 [3].)

Petitioners had been informed that all of the people whom they were charged with soliciting through McGlenon were interested in retaining the same attorney selected by Bowser and Johnson. These boys had no motive other than to assist their injured teammates. Johnson testified: ''We were interested in the guys who couldn't get around and, you know, couldn't do any leg work. We were worried about the guys who were hurt real bad back there. . . . We were really close, and when something happens to your immediate group you are interested in all of them getting all they can and getting everything squared away.'' He testified that before he left Toledo he had discussed the subejct of hiring a lawyer with Woods, Kelly, Adams, Marinai and his parents, Mrs. Shimek, Ross, Stork, Dauphin and Nettleship. He was questioned at length on what he told McGlenon about the facts of the accident and whom he told McGlenon to see in Toledo. He testified that ''we were going to stick together, basically because the fellows back there were in bad shape and couldn't do much leg work themselves. And we asked him [McGlenon] to go back there and see the fellows. In fact, we called Bill Ross right from Carl's house and told him that Mr. McGlenon was coming out there to talk to them, because he had made a

---

[3]The expert witnesses called by petitioners were not in agreement as to whether an investigator introduces the subject of employment of counsel at the outset of an interview. According to one, the investigator's job is primarily to ascertain facts and thus he would not ask the witness at the outset whether he had counsel. The other witness testified that an attorney or investigator should not interview a witness represented by counsel and should at the outset determine this fact.

specific point of getting all the information he could. While it was still fresh in their minds, Carl and I suggested that he go out there and see them right away. . . . Q. [by Committee Member Adler]: Did you give him the names of all the fellows you have given to us who were back in Toledo who indicated one way or another they wanted to go along in a group to hire a lawyer? A. Right. . . . Q. My question is whether you told Mr. McGlenon that he should tell the other people you had selected Belli, Ashe & Gerry as the attorneys for the group? A. I am sure we said that. Q. When you say 'we,' to whom do you refer? A. Carl [Bowser] and I, because we happened to be together." He was asked if there was any reason why he and Bowser selected Ross as the one to tele- phone reporting that they had signed agreements to retain petitioners' firm, to which he replied that "Ross was han- dling that show there," and it was unnecessary to "call every- body specifically when you can call one to do the whole job."

In answer to a question as to what he recalled about his conversation with Marinai, Johnson replied: "Well, I told Al again that by sticking together I felt we could get a better deal. This was new to us. We weren't used to getting lawyers. In fact, I wasn't familiar with one. We told him again that we would stick together and try and find one who would work with all of us and help us all out. Of course, primarily I talked to Al's father, his folks, because Al didn't answer me a lot of times. He was in a lot of pain."

Mr. Bowser testified that he was in the hospital seven days and was ambulatory during the last five days. He discussed the subject of hiring an attorney to represent the interests of the team with Kelly, Nettleship, Woods, Marinai, and Walter Shimek's mother; Walter "wasn't coherent," and he didn't talk with him. After he returned to Bakersfield and engaged petitioners' services, he telephoned Bill Ross in Toledo, talked with both Mr. and Mrs. Ross, and told them he had made arrangements for an attorney. He told McGlenon specifically to see Mr. and Mrs. Ross; he did not recall telling him to see anyone else.

That Kelly and Marinai had no recollection of either Bowser or Johnson discussing with them the subject of hiring a lawyer merely presented another conflict in the evidence. While there is no reason to disbelieve their testimony, it is somewhat weakened by the fact that both Kelly and Marinai were severely injured and under sedation for pain, and Kelly

particularly admitted that most of the discussions he had during the first ten days in the hospital "were pretty vague."

There were many inconsistencies between McGlenon's written report and his testimony at the hearing. In testifying about his interview with Russell Woods he said that Woods, like most of the boys, "volunteered" the subject of employment of an attorney. He testified that he did not ask the injured passengers if they had attorneys; the ones who did "offered" that information. He reported that Kelly "informed me that he had Mr. Chaim, who is a friend of yours [petitioner Ashe] in Bakersfield, as his attorney." He testified that he "never heard of that lawyer before. . . . He's not anyone around this area." He testified that his report was inaccurate in recounting his interviews with Mrs. Shimek and the Lutheran minister. He reported that he had "a long conversation" with Mrs. Shimek; he testified that it was a brief conversation and he talked with her just out of sympathy because she knew nothing about the crash. He testified that he did not discuss retaining counsel with Mrs. Shimek and that she "volunteered" that she was not going to employ an attorney until her son was better. He testified that it was the minister who introduced the subject of counsel and "volunteered" to talk with Mrs. Shimek. Concerning the accuracy of his report, McGlenon at one point said, "when you look at it six years later, it is amazing the language I used."

On the other hand, in response to Chairman Anthony's question, "Does it [written report] accurately reflect your activities in Toledo and the information you obtained in Toledo?" he replied "Yes." The report, dictated shortly after his return when he had no motive to falsify, is more credible than his testimony at the hearing that he did not initiate the subject of counsel in his interviews.

The principal transgression reflected in McGlenon's report is his interview with an unnamed Lutheran minister where he reported that the minister "*agreed with me* that Mr. Belli certainly should be the one person in the United States to handle Mr. Shimek's case. He *further agreed with me* that on his next interview with Mrs. Shimek he *would prevail upon her to join with the rest of the boys in employing this office as counsel.*" (Italics added.) The minister was not a prospective client, and there is no evidence that he ever relayed McGlenon's recommendation to Mrs. Shimek. McGlenon's impropri-

ety falls short of the solicitation that will. warrant disciplinary action against his employers.

At the second evidentiary hearing, conducted for the purpose of determining whether petitioners had ratified McGlenon's conduct, petitioner Gerry testified that he did not interpret McGlenon's report as anything other than a discussion between him and the minister about Mr. Belli, and he did not believe McGlenon requested the minister to recommend the firm. Petitioner Ashe also testified that when he read McGlenon's report he did not get the impression that there were any acts of solicitation reflected in the report. Petitioners' testimony is not implausible. So far as the record in this case shows, they proceeded ethically from the time they were first approached by Mr. Thompson on behalf of Carl Bowser. They sent no one to Bakersfield until Bowser requested them to do so, and petitioner Ashe did not go to San Luis Obispo to interview any of the group that Bowser and Johnson called together until requested to do so by Ted Tollner. Petitioners' condonation of McGlenon's interview with the minister as ratification of an act of solicitation is too unsubstantial to justify finding a wilful violation of the Rules of Professional Conduct in light of their prior method of dealing with the victims of the Cal Poly disaster.

The circumstances of this case are similar to *Hildebrand* v. *State Bar*, 18 Cal.2d 816 [117 P.2d 860], where a doctor, who was asked by patients in a hospital to recommend an attorney, recommended the petitioner. At the request of the doctor, the petitioner went to the hospital and interviewed prospective clients, who signed agreements to employ him. The patients testified that they had not asked anyone to come to see them and had not discussed prospective employment of an attorney with anyone. Resolving the conflicting evidence of the doctor and the petitioner that the petitioner had been requested to call on the patients, as against the patients' testimony that they had not done so, this court said that "it is entirely reasonable to conclude that when petitioner went to the hospital he was doing so in entire good faith and upon the justifiable assumption that he was there to meet persons who desired to employ him. There was no solicitation on petitioner's part or any unethical conduct in going to see those persons under such circumstances. If such were solicitation an attorney would never be permitted to speak to a prospective client concerning prospective professional employment except in those instances only in which the client personally asks for an attorney to represent him in some manner." (P. 822.)

The reasoning of the above case is applicable to the facts here. When petitioners sent their investigator to Toledo they were acting in entire good faith and on the assumption that those persons named by Bowser and Johnson were interested in employing them. Whether or not their teammates requested Bowser and Johnson to contact petitioners on their behalf, these two boys believed that they were doing a favor for their teammates, who were confined in the hospital thousands of miles from home and were unable to do any "leg work" for themselves, when they asked McGlenon to tell them that petitioners' firm was the one selected by them to represent the group.

The charges that McGlenon asked and advised Kelly, Stork, Woods, Mrs. Shimek, and Albert Marinai's parents to employ petitioners are not sustained by convincing proof and to a reasonable certainty. ▉ In response to a subpoena duces tecum, Albert Marinai produced a copy of Ready for the Plaintiff, by Mr. Belli, received from McGlenon. The Rules of Professional Conduct prohibit solicitation by a member of the State Bar by "[u]sing . . . books . . . to advertise the name of a lawyer or his law firm." (Rule 2, section a(2).) Neither of the petitioners authorized or instructed McGlenon to take any books with him, and they did not know he had done so. They cannot be disciplined for McGlenon's misdeed of which they had no knowledge and had not authorized. (*Burke* v. *State Bar*, 218 Cal. 143, 146 [21 P.2d 577].)

▉ Under the circumstances of this case, petitioners did not violate rule 2, section a(1) and (2), prohibiting solicitation by a member of the State Bar, nor did they wilfully employ McGlenon to solicit professional employment for them in violation of rule 3 of the Rules of Professional Conduct.

The State Bar notes in its brief that since petitioner Ashe handled only the pleadings and legal research he may be less blameworthy than petitioner Gerry and that a lesser discipline would seem in order. However, in view of our conclusion that the charges have not been proved, they must be dismissed against both petitioners. It is therefore unnecessary to consider the contention that they were prejudiced by the State Bar's delay in prosecuting the charges against them.

It is ordered that the charges against petitioners be dismissed.