[L.A. No. 29746. In Bank. Nov. 18, 1971.]

NELSON M. MILLSBERG, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

White, Price, Froehlich & Peterson and Charles W. Froehlich, Jr., for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar that petitioner be publicly reproved. Petitioner, admitted to practice in 1962, was charged with violations of rules 2 and 3 of the Rules of Professional Conduct. Both rules concern the solicitation of professional employment.

A local administrative committee appointed to conduct an inquiry into petitioner's activities concluded, after hearing, that petitioner had not violated his oath and duties as an attorney by reason of the fact that his conduct appeared to be a group legal service sanctioned by recent court rulings. The local committee accordingly, on September 3, 1968, recommended that the charges be dismissed. On December 13, 1969, after hearing, the Disciplinary Board[1] unanimously determined that during the period Janu-

---

[1] Three of a total of fourteen members of the board disagreed with the discipline imposed although only two thought it to be excessive.

ary 1—May 8, 1967, petitioner had violated rule 2[2] but had violated no other rule of the Rules of Professional Conduct. Such violations occurred during the period that he had served as attorney for the San Diego Apartment and Rental Owners Association, Inc.

## Scope of Review

In a proceeding "to review or to reverse or modify any decision reproving a member of the State Bar . . . the burden is upon the petitioner to show wherein the decision or action is erroneous or unlawful." (Bus. & Prof. Code, § 6083, subds. (b), (c).) ■■ Findings of fact in such a proceeding are not binding upon this court, although they are afforded great weight; it is our duty to reweigh the evidence and pass on its sufficiency. (*Crooks* v. *State Bar* (1970) 3 Cal.3d 346, 354-355 [90 Cal.Rptr. 600, 475 P.2d 872]; *Ashe* v. *State Bar* (1969) 71 Cal.2d 123, 133 [77 Cal.Rptr. 233, 453 P.2d 737].) ■■ It is petitioner's burden to demonstrate that the findings are not supported by the evidence, or that the recommendations are unlawful or illegal, but in this determination "all reasonable doubts will be resolved in favor of the accused and if equally reasonable inferences may be drawn from a proven fact, the inference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted." (*Himmel* v. *State Bar*, 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993]; *Ashe* v. *State Bar*, *supra*, 71 Cal.2d at p. 133; *Steiner* v. *State Bar* (1968) 68 Cal.2d 707, 708-709 [68

---

[2]Rule 2 provides in part as follows:

"Section a. A member of the State Bar shall not solicit professional employment by advertisement or otherwise.

"Without limiting the generality of the foregoing a member of the State Bar shall not solicit professional employment by

" . . . . . . . . . . . . . . . . . .

"(2) Using a newspaper, magazine, radio, television, books, circulars, pamphlets, or any medium of communication, whether or not for compensation, to advertise the name of the lawyer or his law firm or the fact that he is a member of the State Bar or the bar of any jurisdiction; nothing herein shall be deemed to prevent the publication in a customary and appropriate manner of articles, books, treatises or other writing. . . .

"Section b. Nothing in this rule shall be deemed to prevent the use, in the usual and customary manner, of ordinary professional cards, provided, however, that such use shall not extend to publication in newspapers or other media; nor shall this rule prevent listings in classified sections of telephone and city directories or usual and customary listings in conventional legal directories or law lists, provided, however, that a listing in a telephone or city directory shall not be in distinctive type, style or form or contain anything other than name, address, telephone number and designation as an attorney at law. . . .

"[N]othing in this rule shall be deemed to prevent a member from circulating among lawyers only, a brief, dignified notice that he is rendering a specialized legal service. . . ."

Cal.Rptr. 729, 441 P.2d 289].) ▮ "In meeting this burden, the petitioner must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty." (*Himmel* v. *State Bar, supra,* 4 Cal.3d at p. 794.)

## The Findings

The board found in substance that petitioner from January 1 to May 8, 1967 was employed by the San Diego Apartment and Rental Owners Association, Inc. (sometimes hereinafter referred to as Association or AROA) as its attorney; that the Association distributed to members and nonmembers several publications, one of which was a magazine entitled Rental Owners News (sometimes hereinafter referred to as RON); that said publication identified and advertised petitioner as Association attorney or as an attorney at law; that said magazine stated that members of the Association could obtain free legal advice from petitioner as Association attorney on problems peculiar to rental and ownership of apartment units; that copies of RON were made available to all members and to advertisers and other nonmembers; that during the period petitioner was aware of the activities of the Association "and had the ability to control and eliminate the said identification and advertising of [himself] yet [he] did not do so except [to] have the Association block out his name as attorney for the Association in the masthead of the publication." (Finding V of Disciplinary Board.)

## Background History

As the Disciplinary Board found that petitioner had violated rule 2 of the Rules of Professional Conduct during the period that he served as Association attorney (January 1-May 8, 1967) the circumstances of petitioner's membership in and activity on behalf of AROA prior to that period are relevant but only to the extent that they demonstrate his knowledge of the procedures, programs and internal management of the Association. Such information may relate directly to his ability to control releases in brochures and other publications of the organization and may be pertinent, if at all, for purposes of determining the wilfulness of the violations of rule 2.

AROA is an incorporated trade association which has existed for many years and whose purpose it is to advise and assist owners of rental property in the San Diego area. Two categories of membership are available, general and associate. One must own rental property to qualify as a general member while associate members generally are in businesses which relate to ownership and management of rental units or provide services for the owners or managers thereof.

According to petitioner, he had obtained a real estate salesman's license in 1955 and a broker's license in 1957. Although he had been aware of the Association during that period and had been solicited to seek membership, he did not in fact join the organization until shortly after his admission to the bar in 1962. As he at no time was the owner of any rental units, he was classified as an associate member. To an inquiry as to why he had joined the Association petitioner gave an equivocal answer and admitted that he could not recall having taken advantage of any of the services which were available to the membership.

Petitioner served the Association in a variety of capacities between 1962 and 1967 including two terms as president during the calendar years 1965 and 1966. On numerous occasions, beginning in 1964, he contributed articles of a legal nature to the Association magazine, Rental Owners News, and he spoke at general meetings and special seminars on legal subjects of interest to the members. Prior to assuming the office of Association attorney on January 1, 1967, petitioner frequently was referred to in the pages of RON directly or indirectly as an attorney. In the November 1964 issue he analyzed Proposition 14, a measure which was directed toward the repeal of the Rumford Act, and he was identified at both the beginning and end of the article as an attorney. In the same issue on the cover of the magazine appeared the announcement of the November general membership meeting which stated that "Millsberg and panel" would discuss "Stop Rent Losses." On this occasion no mention was made of the fact that petitioner was an attorney.

The April 1965 issue of RON announced that (Association president) Millsberg would address the April general membership meeting on the subject of estate planning and described petitioner as an attorney who would present the subject to the members and nonmembers "expertly and understandably." The announcement exhorted the members to bring their friends and neighbors and to tell them that plenty of free parking was available. The issue carried on its cover a large photograph of petitioner together with the title of his speech, "Sorry, Charlie, You Can't Take It With You."

The January 1966 issue again carried a large photograph of petitioner and on page 3 thereof appeared a highly laudatory article announcing his reelection as president of AROA and describing him as a "gifted, personable young attorney." Comment was made that "We [the Association] have had a year of mature, dignified leadership from our young attorney. . . ."

In the June 1966 issue appeared a notice of a panel discussion concerning "Legislative Developments and Legal Problems" and petitioner was identified by name only as one of the panelists. Again, in the December

1966 issue he was identified by name only when it was announced that he would speak at the meeting to be held that month on the subject "To Evict or Not to Evict."[3]

Some mention must be made of legal services programs carried on by AROA and the publicity attendant thereto. The November 1966 issue of RON (which was published at the time petitioner was president of the Association) carried an advertisement entitled "What Can AROA Do For You?" Listed among the benefits of membership appeared the following: "LEGAL ADVICE—Association attorney is ready to answer legal questions about your rentals." Similar advertisements appeared frequently in issues of the Rental Owners News. RON also published the name of the Association attorney and his telephone number on the magazine's masthead. A membership brochure entitled "Why You Should Join the Association Now!" did not identify the attorney by name but did carry a brief description of the legal services provided which included the furnishing of legal forms by the Association and the giving of legal advice by the Association attorney. Additionally, a form letter addressed to "Dear Property Owner" included among the services offered to Association members the following: "LEGAL ADVICE—Telephone advice from the Association's attorney is available to *members* at no cost."

The Rental Owners News was distributed at no charge to all members of the Association and additional copies were provided advertisers or were used for promotional purposes. The approximate monthly circulation of RON varied throughout the years as is set forth in the margin.[4]

### *Petitioner's Activities—January 1-May 8, 1967*

Sometime after January 1, 1967, at the conclusion of his second term as president, petitioner became Association attorney. The March 1967 issue of RON in an advertising block approximately 2 by 2¼ inches in size carried in bold type the announcement that "Nelson Millsberg has been

---

[3]The announcement in full read as follows: "DECEMBER MEETING—Friday, December 16, 7:30 P.M. 'To EVICT OR NOT TO EVICT'—President Nelson M. Millsberg . . . Mr. Millsberg will tell you how to handle evictions, how to fill out forms AROA has for you, how to handle tenant problems to avoid costly legal actions. He has the answers to more questions than you know." Again members were urged to invite nonmembers as guests.

| [4]Date | Members | Advertisers | Nonmembers | Promotion |
|---|---|---|---|---|
| 1/1/63 | 928 | 50-100 | 50 | |
| 1964 | 911 | " | " | 200 |
| 1965 | 1001 | " | 55 | Average |
| 1966 | 1002 | " | 60 | |
| 5/8/67 | 1030 | " | 60 | |

selected as our AROA attorney. . . . April issue will carry full details of the service." A column entitled "Why You Should Join the Association Now!" continued to appear and mention was there made of the legal advice program although the name of the attorney was not mentioned in connection therewith.

The Association conducted a specialized legal services program which required certain duties to be performed by its attorney.[5] As a part of such program the attorney answered questions of members by telephone, advised the Association with regard to legal matters, evaluated and explained recently enacted or proposed legislation, wrote articles of a legal nature in areas of membership interest and kept current the legal forms which were distributed by the Association to its members at no cost. Petitioner at the time he became AROA attorney agreed to perform such services for a retainer of $50 per month.[6] Petitioner from time to time also accepted employment from members of the Association who had telephoned him for legal advice. Such services were generally of a more complicated nature than those contemplated by the agreement with the Association and frequently had nothing to do with problems relating to ownership or management of rental units. For such services petitioner was compensated directly by the client.

Sometime prior to the meeting of the board of governors of AROA held on February 3, 1967 plans were made for the holding of a management seminar by the Association.[7] The February 1967 issue of RON con-

---

[5] The minutes of the meeting of the board of governors of AROA held December 2, 1966 contain the following entry: ". . . Again there was a detailed discussion of our present legal service. Mr. Millsberg [president] said he was providing a considerable amount of that service. It was brought out that this service is very time consuming and not very rewarding to the one performing it. . . . Mr. Millsberg said the advice through the Lawyers Reference Service had just gone up from $5.00 to $10.00 for one call, and that any educating will have to be done discreetly to avoid irritating the Bar Association. . . ."

[6] The minutes of the meeting of the board of governors of AROA held February 3, 1967 contain the following entry: "Mr. Millsberg proposed to write an Association-attorney agreement in letter form, effective February 1. In it he will agree to answer telephone questions from members and advise them. *Anything beyond this will be individually arranged.* He will keep a record of all calls and their approximate disposition. He expects calls to average about 50 a month. . . . For this his remuneration will be $50 a month, to be paid as the board wishes. . . . He will advise the office on legal matters and write about six articles for RON that can be kept and used for reference. . . ." (Italics added.) "Mr. Millsberg is trying to motivate the municipal courts to accept a group of experts from the Association to give advice to judges in the Small Claims Court."

[7] The minutes of the meeting of the board of governors of AROA held on February 3, 1967 contain the following entry: ". . . Mr. Boynton detailed more of his plans for the management seminar. Over 50 reservations have been taken already. An attendance of 300-400 is expected. Registrations will be $20 for members, $25 for

tained a double-spread announcement of the seminar to be held on April 22 "featuring MR. WILLIAM NICKERSON AND SIX *SPECIALISTS*." (Italics added.) Petitioner was designated as one of the specialists in the following fashion: "LEGAL FORMS AND HOW TO USE THEM. FORMS WILL BE SUPPLIED. Speaker—Nelson Millsberg, AROA Attorney and Past Pres. of AROA." The March issue of the same magazine again conspicuously advertised the forthcoming seminar and announced that "Nelson Millsberg, AROA Attorney and Past Pres. of AROA" was one of "FIVE SPECIALISTS" who would appear on the program and who would speak on evictions, on the use of forms and on other related legal matters including attorneys' fees.

A photograph of each of the participants also appeared in the March issue of RON and petitioner was described as: "AROA Attorney, Certified Property Manager, Apartment owner and developer, Immediate Past President of AROA."[8] Members of the general public were invited to attend and a registration form was printed at the bottom of the page bearing the photographs. The April issue of the Rental Owners News carried advertising and photographs in every important respect identical to that contained in its issue for March.

It was at the meeting of the board of governors held on May 5, 1967 that the subject of a buyers' guide was discussed. The minutes reflect that petitioner was present and indeed he admitted that he attended the meeting. The minutes further reflect that one of the board members reported that the May issue of RON would contain a combination membership directory and buyers' guide and that its potential for advertising income would be tremendous. He reported that a sufficient number of copies would be printed for distribution to the present membership and to new members who might join the Association thereafter.

The RON issue of May 1967 carried such a roster entitled "Buyers' Guide and Classified Directory." Along with such listings as air conditioning and heating—sales and service, appliance rentals, carpets and rugs, concrete contractor, decorating, draperies and numerous other suppliers of goods and services appeared the heading: Attorneys. Petitioner's name, office address and telephone number appeared under such listing together with similar data relating to one other member of the bar.

The minutes of the May 5, 1967 meeting of the board of governors contain additional information of relevancy to this proceeding. It is re-

---

nonmembers with some reduction for multiple reservations. The fee will include printed material, luncheon, six lectures, some books at 20% discount, and various give-away items at the table."

[8]Petitioner's testimony before the Disciplinary Board was to the effect that he had never been an apartment owner.

flected therein that petitioner reported to the board that "he had to appear before a California Bar Association inquiry on May 8 because we have been pushing our attorney service too much. He [petitioner] reviewed the publicity this service has been given both recently and in the past. Any mention *in writing* of this service must be avoided. He requested several months ago that the attorney's name be deleted from the masthead of RON." (Italics added.) One board member wondered what effect this would have on membership sales. "Mr. Millsberg said this service can still be made known *through word of mouth*." (Italics added.)

### Evidence Supports Findings

As indicated, *supra,* findings of the Disciplinary Board are not binding on this court but it is our obligation to weigh such evidence and to pass upon the sufficiency thereof. In fulfilling that obligation we have independently reviewed petitioner's activities in connection with and on behalf of AROA during the early part of 1967 concluding with the appearance of the Buyers' Guide and Classified Directory in the May 1967 issue of RON, and have considered his earlier activities commencing with the article in the November 1964 issue of that same magazine only as they may give meaning to the challenged conduct. It is manifest on such record that there existed an accomplished plan or design of publicizing petitioner by identifying him as a member of the bar, lauding his legal expertise, or both. We conclude, accordingly, that through lending himself to such plan or design petitioner has solicited professional employment by advertising, and that he has particularly done so by using RON to advertise his name, his skills and the fact that he was a member of the State Bar. (Rules of Professional Conduct, rule 2(2).) We are confronted with the further question, however, of whether the evidence (presented in documentary form and by testimony of petitioner and others) warrants the conclusion that petitioner wilfully breached the Rules of Professional Conduct.[9]

 "To establish a wilful breach, it must be demonstrated that the person charged acted or omitted to act purposely, that is, that he knew what he was doing or not doing and that he intended either to commit the act or to abstain from committing it. [Citations.] The wilfulness or intent may be proved by direct or by circumstantial evidence. [Citations.]" (*Zitny* v. *State Bar,* 64 Cal.2d 787, 792 [51 Cal.Rptr. 825, 415 P.2d 521].)

---

[9]Business and Professions Code section 6077 provides as follows: "The rules of professional conduct adopted by the board, when approved by the Supreme Court, are binding upon all members of the State Bar.

"For a wilful breach of any of these rules, the board has power to discipline members of the State Bar by reproval, public or private. . . ."

■ "The rules are designed to establish ethical standards for the Bar and to 'prohibit unprofessional conduct.' [Citations.] It is also immaterial that petitioner may have been ignorant of the provision . . . that he violated." (*Zitny* v. *State Bar* at p. 793.) ■ A mistake of law made in good faith may be a defense to an alleged violation of Business and Professions Code section 6067 (oath upon admission) (see *Call* v. *State Bar*, 45 Cal.2d 104, 110-111 [287 P.2d 761]) but "In contrast section 6077 proscribes any wilful violation of the Rules of Professional Conduct and does not make knowledge of the rules an element of the offense." (*Zitny* v. *State Bar* at p. 793.)

Petitioner in the instant case must be deemed to have been aware that he was participating in activity which advertised his skills as a lawyer. For three years prior to his charged misconduct he had been active in the affairs, and for a two-year period of that time had been the chief executive officer of the Association. We are thus persuaded that he had become aware of the nature of the articles and other materials appearing in RON, how they were included or excluded from publication in that magazine, the nature of the content of the published materials, to whom the magazine was distributed and its effectiveness in bringing its published materials to the attention of commercially and professionally interested readers. ■ We conclude that petitioner acted or omitted to act purposefully in the publication of the advertising materials, and that the breach of the Rules of Professional Conduct was thus wilful. As previously indicated, petitioner admitted that he was responsible for the deletion of the name of the Association attorney from the masthead of RON. We are persuaded that petitioner also could have caused the deletion of other material which was in violation of rule 2 of the Rules of Professional Conduct had he desired to do so.

Publication of this opinion will constitute sufficient public reproval of petitioner.

**MOSK, J.—I dissent.**

The effect of this public reproval of the petitioner may appear to be of relative insignificance, but upon closer analysis the opinion is of transcendent importance to the legal profession generally.

Upon seemingly trivial provocation the State Bar and the majority of the court have taken action which is likely to produce an inhibiting effect upon community service and pro bono publico activities of countless members of the bar throughout the state.

Lawyers are equipped by education, experience and idealistic motiva-

tion to join a wide variety of community agencies. Peripatetic members of the bar are found in virtually every type of patriotic, educational, fraternal, social, cultural, eleemosynary and political organization, and it is almost inevitable that lawyers, being skilled and articulate, assume the positions of authority. As Professor James Willard Hurst wrote in The Growth of American Law (1950) page 355: "The lawyer [has] won his public leadership in the past largely because his profession helped make him a more objective and resourceful mediator of forces." Indeed it is to the everlasting glory of our profession that so much of individual intellectual resources is devoted to the furtherance of the ideals and projects of community service groups. But, as Hurst observed (id. at p. 352), "this [is] not an unnatural aspect of a profession which [is] so directly and regularly called on to exercise wide-ranging skill in adjustment of human relations."

It is also inevitable that the lawyer who assumes a position of responsibility in an organization other than a bar association will be identified, for the prestigious effect, as a lawyer. Rather than suggesting reproval or censure, however, this identification reflects favorably upon the legal profession.

I have looked in vain in the record for any activity by the petitioner that indicates intentional solicitation, advertisement or self-laudation. He served an association of apartment and rental owners diligently, gave lectures, wrote educational articles, and used his talents to assist the organization in solving its legal problems.

As the Standing Committee on Professional Ethics of the American Bar Association stated in its Informal Decision No. 528 (1962), it "is in the public interest that the lay public be generally informed about legal matters. . . . Lawyers who unselfishly give their time in such a cause [informing the lay public generally about legal matters] should not be deemed in violation of Canon 27 because incidentally they publicize themselves and show their competence to deal with the matters discussed."

Similarly, an opinion of the Committee on Professional Ethics of the State Bar of California (1966-6) gave its approval to an attorney, identified as such, writing a regular column on real estate law for a real estate publication. It would seem that if a regular column by an attorney was permissible, a fortiori the petitioner's occasional articles and infrequent seminar lectures should not be proscribed.

One suspects the State Bar fears that the association activities of petitioner might produce law business. It seems to me that if, because of petitioner's gratuitous assistance to the group, a member thereof might

feel inclined to seek his professional advice or services on an individual basis, no violation of legal ethics is indicated.[1] Quite the contrary, such reason would appear to be a more rational basis for selection of a lawyer than that which motivates many clients.

Lawyers who read the majority opinion and relate to the instant circumstances may pause, reflect, and be dissuaded from engaging in community and organizational activities. The communities, organizations, and the prestige of the bar will be the losers, not merely this petitioner.

I would dismiss the proceeding.

Peters, J., and Tobriner, J., concurred.

---

[1]Judge Charles E. Wyzanski, Jr., in his book of essays on ethics and the law, Whereas—A Judge's Premises (1965), saw the problem in this candid manner: "I know that lawyers serve on boards of charitable institutions, on hospital boards, on university boards, and in other philanthropic causes; and in those aspects give their time. But some objective observer might say, however noble the motive, such association may have as its by-product some professional advantage. . . . We must be realistic enough to recognize that when we deal with the problem of public responsibilities of the bar, we are involving ourselves in something more than the work of a good Samaritan." (Pp. 234-235.)