[L.A. No. 29664. In Bank. Oct. 29, 1970.]

JOHN E. CROOKS, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

John E. Crooks, in pro. per., and Joseph R. Laird, Jr., for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a decision of the State Bar Disciplinary Board publicly reproving petitioner. (Bus. & Prof. Code, § 6083, subd. (b); rule 59(b), California Rules of Court.) The reproval is based on petitioner's knowing disregard of his responsibilities as a fiduciary in handling escrow funds.

On or about September 11, 1964, petitioner was requested by Orange County Business Sales, a business opportunities broker and his client, to act as escrow holder in connection with the sale of a beer bar business, known as Bristol Gardens, from Mr. and Mrs. Harold Torborg to Robert E. Dobucki. The escrow instructions prepared by petitioner provided that the buyer would deposit $2,000 in cash and assume a conditional sales contract on certain bar fixtures held by Dunkirk Investment Company. An additional $2,000 cash was to be supplied by "deposit by vendor" ("vendor" meaning a company who advances money to an establishment in exchange for the right to install coin-operated vending machines in the premises). As escrow holder, petitioner was instructed to pay "forthwith out of the first cash funds deposited into escrow" the broker's commission of $1,250, all delinquent payments on the conditional sales contract held by Dunkirk, and all delinquent rent. The escrow was to close "when the beer license is transferred and the Sellers have deposited into escrow releases from the Department of Labor and the Board of Equalization."

Out of the $2,000 deposited by the buyer, petitioner disbursed $1,250 to the broker and $650 to Dunkirk in part payment of the delinquencies on the conditional sales contract, leaving a balance of $100 of escrow funds on hand.

Petitioner was notified by the vendor, Rockwell Music Company (hereafter called Silco[1]), that it intended to advance $2,000 to the buyer for the exclusive rights of supplying music through a coin-operated phonograph in the bar, repayment of the advance to be made from collections from the machine. Thereafter Silco's check was hand-delivered to petitioner by Mr. Connors, an employee of the broker, with a letter dated November 19, 1964, reading: "Escrow Instructions: You are herewith handed our check #1794 in the amount of two thousand dollars ($2,000.00) made payable to Robert E. Dobucki dba Bristol Gardens which *you are hereby authorized to deliver to Robert E. Dobucki only upon the close of your escrow and the issuance of his license.*" (Italics added.) Outside of escrow, Silco procured the buyer's note for $2,000. The check bore the purported endorsement of the buyer, and petitioner deposited it in his Crooks & Laird law partnership trust account.

At the same time he received Silco's letter and check, petitioner received another demand from Dunkirk for $1,309.70 representing five past due installments on the conditional sales contract. He told Connors he could not comply with Silco's instructions to hold the check until the close of escrow and also follow his own instructions to pay claims against the escrow and would have to have different instructions from Silco. Connors said he would get amended instructions but did not do so. About a week later petitioner received a claim from the buyer for $1,051 representing the cost of needed repairs and replacements that the seller was required to, but did not, make. Faced with these demands and only $100 in funds, petitioner telephoned Mr. Johnson, Silco's manager, on December 8, 1964. Petitioner's version of their telephone conversation was that he told Johnson it was impossible to comply with his (Johnson's) instructions because the sale was conditioned upon the buyer's obtaining an immediate loan from the vendor to make payments that were due on equipment and unpaid rent. Johnson told him that he would be willing to give petitioner a different letter if he wanted one but Johnson was of the opinion that the letter was sufficient to allow petitioner to do what needed to be done. Thereafter petitioner noted on Silco's letter: "12/8/64—called Johnson—he said go ahead and use the $2,000 *to close escrow.*" (Italics added.) Johnson testified that petitioner sought permission to cash the check and was told that he definitely could not cash it prior to close of escrow. He did not know that the check had already been cashed because cancelled checks went to the company's New Jersey office.

---

[1]Rockwell Music Company is a division of Silco Automatic Vending Machine Company, a New Jersey corporation. Mr. Andrew Johnson was manager of Rockwell and vice president of Silco. The litigation over the check was in the name of Silco, and for convenience the complainant in the disciplinary proceeding will be referred to as Silco.

On December 10, 1964, petitioner paid Dunkirk's demand for $1,309.70 ($1,209.70 of Silco's money and $100 of the buyer's) leaving a balance on hand of $790.30. In the meantime, the beer license was transferred to the buyer and Silco installed some of its vending machines. After operating the bar for about three months Dobucki closed the door and walked out. The releases from the Department of Labor and Board of Equalization had not been received, and the escrow had not closed.

On January 6, 1965, Silco notified petitioner that it was stopping payment on its check and rescinding its authorization to deliver the check to Dobucki, and requested petitioner to return the check. Shortly thereafter, Dobucki notified petitioner that "inasmuch as the escrow instructions have not been complied with," he was withdrawing from the escrow and requested a return of all monies deposited by him as well as Silco's check. After learning from petitioner that the check had been cashed and about $1,300 had been spent, Silco claimed that Dobucki's endorsement was forged and was successful in having petitioner's trust account charged with $2,000. However, negotiations between petitioner and the bank's attorney resulted in restoration of that amount to his trust account.[2]

On March 6, 1965, petitioner filed a complaint for declaratory relief, alleging that a controversy existed among the parties as to their rights and duties; that he held $790.30 "for the use of the defendants in whatever proportions may be rightfully theirs, subject to reasonable expenses and attorney fees in connection with plaintiff's services in conducting the escrow and of maintaining this lawsuit; plaintiff claims no interest in said sum, but is unable to determine which defendant or which defendants may be entitled thereto." Named as defendants were the Torborgs (seller), Dobucki (buyer) and Silco. The Torborgs and Dobucki were served but did not answer. Silco cross-complained against petitioner, alleging that he failed to return $2,000 on demand and had deposited and disbursed the check in violation of its written instructions. Petitioner answered, denied Silco's allegations, and alleged that he had authority to cash the check.

About two years later the case came to trial. Petitioner testified that Silco's letter of November 19, 1964, was "ambiguous" in that it instructed

---

[2]The circumstances surrounding the procurement of Dobucki's endorsement were never entirely clear. The check was endorsed when petitioner received it. Petitioner said that after the dispute arose Connors told him that Steffano, an employee of Dobucki, had endorsed the check in Dobucki's name and that he had authority to do so. At the committee hearing, Connors had only a vague recollection of the transaction; he did not know who endorsed the check but was sure he had not told petitioner that Steffano endorsed it. Dobucki denied having endorsed it. A "questioned-documents" expert compared Dobucki's admitted signature on the escrow instructions with the endorsement but was unable to render an opinion whether they were made by the same person.

him to deliver the check at the close of escrow when the facts as he understood them would make it impossible for the escrow to close unless Silco's money were used to pay debts of the seller, and further "it is an ambiguous situation to me when I have an endorsed check that I am supposed to keep, rather than deposit." In answer to the question, "It [the letter] says, does it not, there are two conditions before you pay the money, two conditions to be fulfilled before you are to give Mr. Dobucki the $2,000 check. Is that correct?" he replied, "Well, it says what it says." As to his telephone conversation with Johnson on December 8, 1964, petitioner testified that he sought and received oral authorization to use Silco's check "as was necessary in order to get this escrow closed." Petitioner did not indicate what he considered to be reasonable attorney's fees; he spent $14.50 for publishing and recording a notice of sale in connection with the escrow and $47.55 for filing the complaint and serving summonses.

Mr. Johnson testified in the civil action that Mr. Connors of Orange County Business Sales applied for a loan on Dobucki's behalf; that he (Johnson) agreed to lend him $2,000 for the privilege of placing pool tables, juke boxes and cigarette machines in the bar; that his letter to petitioner was a form letter sent to every escrow officer, containing two conditions that had to be satisfied before delivery to the borrower, since it was his company's policy not to permit the use of its money before close of escrow; and that he had not read the escrow instructions prepared by petitioner, was not aware that the loan was sought to facilitate the purchase of the bar, and had he been aware of such fact he would not have approved the loan. Regarding the telephone conversation between petitioner and himself, Johnson testified that he told petitioner that under no circumstances was he to cash the check. After he learned that the check had been cashed he telephoned petitioner and asked that the money be returned. Petitioner told him he had disbursed about $1,300 and there was approximately $700 left. Johnson refused petitioner's offer to send him the $700 and wanted his $2,000 back.

Called as a witness in the civil action, Dobucki testified that he borrowed $1,000 from Silco to be used "to try to get the business on its feet," and that an additional $2,000 was to be placed in escrow and paid at the end of escrow; that he had received a copy of Silco's letter to petitioner and was aware that a $2,000 check had been placed in escrow; that the money was borrowed to purchase the bar and on the close of escrow he would receive only a portion of the proceeds for himself; that he had not endorsed the check and had not authorized anyone to disburse the proceeds; that he received his beer license and operated the bar for about three months; and that during that period Silco had placed coin machines in the bar, had

split the income from the machines with him and applied part of it toward repayment of the $1,000 loan.

At the conclusion of the trial, the court found that petitioner had come into court with unclean hands, had not sustained his burden of proof on any issue, and the cross-complainant had sustained its burden of proof on all issues. The court adjudged that petitioner disposed of the $2,000 deposited by Silco contrary to instructions, and ordered judgment for Silco for $2,000 plus interest, costs and a prior sanction of $100 that had been imposed against petitioner for failure to answer interrogatories.

After judgment petitioner did not transfer the remaining escrow funds to Silco, nor did he pay any part of the judgment. About two months later he filed a petition in voluntary bankruptcy, scheduled Silco as one of his creditors and eventually received his discharge. He denied that the adverse judgment affected his decision to file his petition in bankruptcy. In the meantime, after Silco's unsuccessful attempt to collect its judgment, petitioner was examined at a judgment-debtor hearing, at which he testified that for a time the $790.30 remained in the Crooks & Laird trust account and when that account was closed he transferred it to another trust account entitled "Attorney's Title Company" in another bank, and having decided that the funds were not safe from creditors' claims he withdrew the $790.30, obtained a cashier's check therefor and spent the money in satisfaction of personal debts following the judgment.

Silco complained to the State Bar, accusing petitioner of converting $1,209.70 and refusing upon demand to return the remainder following the judgment in the civil action. Responding to the State Bar's inquiry into the complaint, petitioner addressed a four-page letter reading in part: "From your statement of alleged facts and your explanation thereof, I view this as an allegation of two acts of misconduct by a lawyer: 1. an act of breach of fiduciary duty by paying out $1,209.70 on December 10, 1964, and 2. a failure to remit upon demand for $790.30, both amounts being of $2,000 deposited with me by Silco." He recounted his conversations with Connors and Johnson to the effect that unless Silco's money were used to pay demands against the escrow it would never close and that Johnson told him to use the check "to get the escrow closed"; that he then paid Dunkirk's demand; and that although the buyer received his beer license he was unable to close the escrow because releases from the Board of Equalization and the Department of Labor had not been received. Regarding the accusation of converting $790.30, he said the judgment in the civil suit did not make sense to him and he did not understand how Silco was entitled to a $2,000 judgment against him and at the same time to claim the $790.30 as trust funds; that he spent the remainder with the attitude that it was his because of the

result of the litigation; and that he had discussed the matter with other lawyers who analyzed the situation and came to the same conclusion.

Following the preliminary investigation, a notice to show cause issued charging petitioner with violating his oath and duties as an attorney (Bus. & Prof. Code, §§ 6103, 6067, 6068), wilfully violating rule 9, Rules of Professional Conduct (commingling) and with the commission of acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106). It alleged that although the telephone conversation between petitioner and Johnson "is in dispute and is confusing, it appears that as a result thereof you in good faith believed you were authorized to use said $2,000 check for the purposes of making payments on certain arrearages, fees, etc., which were required to be paid in order *to effect a closing of the escrow.*" (Italics added.) It further alleged that during the course of the escrow petitioner used $1,209.70 for the payment of various disbursements necessary in connection therewith, and that after judgment was rendered in favor of Silco for $2,000 plus attorneys' fees and costs, he wrongfully converted and misappropriated the sum of $790.30 which he had been holding in trust.

Petitioner's testimony at the local administrative committee hearing relating to his conversations with Connors and Johnson was substantially the same as his explanation during pretrial, and although he recognized the hazard of relying on Johnson's oral authorization he nevertheless did so when he made the disbursement to Dunkirk. He testified that he had acted as escrow agent in other tavern transactions, had advised others on escrow problems about 250 times, and had litigated problems involving the sale of a liquor or beer bar about 200 times. He said a careful escrow agent who received a letter specifically instructing him to hold a check and deliver it to the payee at close of escrow would not have deposited an endorsed check without receiving amended instructions, and had he been looking out for his own interests he would have refused to accept it. He further said it was customary for business opportunities brokers to receive their commissions forthwith out of the first funds received in escrow.

He had various explanations for spending the remaining $790.30. He at no time believed that Silco had any right to it because Silco had lent the money to the buyer; that he was entitled to it as reimbursement for services and out-of-pocket expenses; that the court in the civil action rendered no judgment on his complaint and, since neither the buyer nor the seller made any claim to it, it must be his; that as a result of the $2,000 judgment in favor of Silco on its cross-complaint the money was not Silco's; and that prior to spending it he had discussed the matter with Mr. Laird and "with

an old-time lawyer named Joe Baily in Long Beach"[3] and it was their opinion that the money was his. When asked why he used the money to pay creditors other than Silco, he replied that he felt they were more entitled to it and he paid the ones he thought were more deserving than others.

Mr. Laird, petitioner's former law partner and his counsel in both the disciplinary proceedings and in the civil action, testified that before the lawsuit he considered it was possible that persons other than petitioner might be entitled to the unexpended escrow funds but that the other parties defaulted; that his attitude, both before and after the lawsuit, was that Silco had no "title position" to the money; that the judgment in favor of Silco was "unrelated to their ownership of that seven ninety"; and that he informed petitioner it could be spent by him for whatever purpose he chose. In describing petitioner's reaction to the adverse judgment, Mr. Laird said "it was a total insult to him, he couldn't understand why a judge decided to select him as the villain unless the judge took a position that Mr. Crooks was lying and Mr. Johnson was not lying."

The local committee accepted as conclusive the preliminary investigating committee's findings that petitioner in good faith believed that he was authorized to use the proceeds of the $2,000 check for purposes of making payments on certain arrearages to effect a closing of the escrow and that during the course thereof he used $1,209.70 for the payment of disbursements necessary in connection therewith. The local committee further found that he appropriated $790.30 to his own use but in doing so relied on the advice of counsel and had in fact a good faith belief that he was entitled thereto. The committee recommended that no disciplinary action be taken.

The disciplinary board, by a vote of 11-1, rejected the committee's recommendation and revised some of the findings. It adopted the finding that petitioner in good faith believed he was authorized to use the check for making payments that were required to be made in order *to effect a closing of the escrow,* but found that he used $1,209.70 contrary to instructions. It further found that he knowingly, wilfully, and without consent used $790.30 that he had been holding in trust and appropriated the same to his own use. A resolution was adopted publicly reproving him. Eight members of the board voted in favor of public reproval; of the four members opposed, three were of the opinion that the degree of discipline was insufficient, and one member voted to dismiss the proceeding.

We have examined the entire record in light of the established rules that the findings of the local administrative committee although entitled to great

---

[3]No evidence was offered as to the existence of Mr. Baily or of any communication between petitioner and Baily.

weight are not binding on this court (*Ashe* v. *State Bar,* 71 Cal.2d 123, 133 [1] [77 Cal.Rptr. 233, 453 P.2d 737]), that a member of the State Bar who petitions this court to reverse a decision of the disciplinary board reproving him has the burden of showing wherein the decision is erroneous or unlawful (Bus. & Prof. Code, § 6083, subds.(b)-(c)) and the burden is on petitioner to show that the board's findings are not supported by the evidence (*Mitton* v. *State Bar,* 71 Cal.2d 525, 526 [1] [78 Cal.Rptr. 649, 455 P.2d 753]). The record discloses that petitioner has not sustained this burden.

Petitioner first contends that it was fundamentally unfair for the board to consider this proceeding on an abbreviated record without furnishing him a copy thereof. Apparently the so-called "abbreviated record" to which he refers is the confidential report of the reviewing board member who is assigned the responsibility of summarizing the record for the convenience of the board at oral argument. This court has held that the preparation of this report is but a step in the private deliberations of the fact-finding body, it forms no part of the record, is not a matter to which petitioner has any right of access, and does not prejudically affect his rights to a fair hearing. (*Petersen* v. *State Bar,* 21 Cal.2d 866, 871 [4] [136 P.2d 561]; *Shaeffer* v. *State Bar,* 220 Cal. 681, 687-688 [3] [32 P.2d 140].)

It is undisputed that Silco deposited its $2,000 check with petitioner in his capacity of escrow holder. ■ "When an attorney receives money on behalf of a third party who is not his client, he nevertheless is a fiduciary as to such third party . . . ■ 'When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct.' " (*Johnstone* v. *State Bar,* 64 Cal.2d 153, 155-156 [2] [49 Cal.Rptr. 97, 410 P.2d 617]; see also *Simmons* v. *State Bar,* 70 Cal.2d 361, 365 [4] [74 Cal.Rptr. 915, 450 P.2d 291].)

Petitioner's testimony was that he was orally authorized by Silco to use its check to close the escrow. His professional duty required him to act with the utmost good faith in exercising his authority. Through no fault of his the escrow did not close, but his anxiety to pay his client in full as promptly as possible is apparent. The only escrow funds disbursed were for the benefit of his client, Mr. C. L. Andrews, who was president of both Orange County Business Sales, the broker, and Dunkirk Investment Company, the holder of the security interest on the tavern's fixtures. Petitioner was a former officer and director of Orange County Business Sales and was its attorney at the time of the sale of the tavern. He had in the past represented Dunkirk in civil matters. The escrow instructions prepared by petitioner favored Andrews' business interests. They permitted petitioner, before close of escrow and regardless of whether it closed, to pay the broker's commission

and all delinquent payments on Dunkirk's conditional sales contract with the seller. Petitioner represented to Silco that he needed to cash the check to close the escrow. It would appear, however, that he called Silco only to free the check's proceeds so that he could satisfy Dunkirk's demand and *did not disclose that it could be paid from cash funds regardless of whether* escrow closed or that he had already cashed Silco's check three weeks before. Clearly escrow did not close because the releases from the Department of Labor and Board of Equalization as required under his escrow instructions as a condition to closing were never deposited in escrow.

Petitioner's assertion that at all times from the receipt of Silco's check until notice of entry of Silco's judgment he believed that Dobucki owned the money it represented, subject to the escrow agreement between him and the seller, totally ignores the record in this proceeding wherein petitioner repeatedly acknowledged that he would have to have a modification of Silco's escrow instructions before he could disburse any of the proceeds. Moreover, he sought authority to use the money from Silco, not from Dobucki.

The board's conclusion that petitioner breached his fiduciary duty rests upon its findings that although petitioner may have in good faith believed he was authorized to use Silco's money to make payments to effect a closing of the escrow he did not in fact use it for that purpose.

■ Petitioner does not contend that the board's finding that he used $1,209.70 contrary to instruction is not supported by the evidence, but contends that it is procedurally wrong for two reasons: first, it is contrary to an implied finding of the preliminary investigating committee as stated as a fact in the notice to show cause that he used the money during the course of escrow to make payments "necessary in connection therewith," and, second, that the trial committee denied a motion to amend the notice to levy any charges relating thereto. In opposing the motion to amend,[4] petitioner argued that the issues as to his authority to cash Silco's check and to disburse part of the proceeds were disposed of and decided in his favor by

---

[4]At the preliminary investigation hearing the complaining witness was represented only by counsel. After the notice to show cause issued, Johnson made a sworn declaration denying that he ever orally modified his original instructions to petitioner. Based on this declaration the examiner filed a motion to amend the notice to strike the paragraph that alleged the disputed telephone conversation between Johnson and petitioner and petitioner's good faith belief that he was authorized to use the check to effect a closing of the escrow, and to amend the succeeding paragraph by inserting the italicized words: "That thereafter *in wilful violation of the aforesaid authorization given you by Silco Automatic Vending Machine Company, Inc.,* the endorsement of Robert E. Dobucki to said check was obtained and you did in fact cash said check and hold said funds; thereafter and during the course of said escrow you did use $1,209.70 of said monies, together with other monies which had come into your possession in connection with said escrow, and for the payment of various fees, disbursements and arrearages in connection therewith."

the preliminary investigating committee and that the only issue remaining at trial was his alleged misappropriation of $790.30. The trial committee agreed with him, but in order to get the background of the entire transaction it permitted oral and documentary evidence relating to the escrow transaction from its inception, subject to motions to strike on the grounds of irrelevancy. After an adjournment, and resumption of the hearing a month later, petitioner's counsel proposed to examine him on the customary practice of escrow agents, and by way of introduction said: "I think anything relevant to the state of mind of Mr. Crooks at the time he performed any of these acts as escrow holder is relevant . . . *even though we do not have an amended order to show cause* we have gone into background information and . . . although we *had* taken a position that we were here only to defend a state of mind at the time following the judgment in the Superior Court I believe *the way things stand now* and particularly based upon evidence that has gone in *the State Bar is interested in all the circumstances* preceding the judgment *with reference to the handling of the escrow itself.*" (Italics added.) In view of petitioner's change of position and his willingness to proceed with the trial as if all the facts surrounding the handling of the escrow were in issue, he cannot now complain that the notice was not amended and that the board's finding did not follow the language of the notice. (Cf. *Hogan* v. *State Bar,* 36 Cal.2d 807, 811 [5] [228 P.2d 554]; *Werner* v. *State Bar,* 24 Cal.2d 611, 623-624 [9] [150 P.2d 892].)

 Petitioner's conversion of the remaining $790.30 was also a breach of trust. (*Johnstone* v. *State Bar, supra,* 64 Cal.2d 153, 155-156 [2].) He contends that the board's finding that he converted that sum is not supported by the evidence because the board did not find that Silco had title to the money. There is no merit to this contention. He admittedly held the $790.30 in trust and disclaimed any interest in it except for his fees and costs. It was not until after the court rendered judgment in favor of Silco and failed to award him compensation for his fees and expenses that he claimed it as his own. He now argues that Silco, having elected to sue for a money judgment, is estopped to claim the $790.30 as trust funds and that estoppel should be applied for his benefit in this disciplinary proceeding.

Silco is not a party to this disciplinary proceeding, and petitioner's indebtedness to Silco by reason of the judgment does not release him from his obligation to answer charges of wrongdoing in the handling of funds in his care. (*Maggart* v. *State Bar,* 7 Cal.2d 495, 502 [3] [61 P.2d 451].) Petitioner was experienced in handling escrows and was familiar with the roles of the various parties in the sale of a tavern, including the role of the "vendor." It is established law that on failure of escrow the funds deposited with the escrow holder are returnable to the respective depositors. (18 Cal.Jur.2d Rev., § 37, p. 371.) Petitioner knew that the $790.30 represented

the remainder of the escrow funds and that Silco's judgment included that sum. Honesty required him to deliver it to the party entitled thereto, and he cannot take advantage of the court's inadvertent failure to specifically order him to do so to justify his appropriation thereof to his own use. Nor can his appropriation be justified as payment for his escrow services and expenses. ■ An attorney may not unilaterally determine his own fee and withhold trust funds to satisfy it even though he may be entitled to reimbursement for his services. (*Most* v. *State Bar,* 67 Cal.2d 589, 597 [5] [63 Cal.Rptr. 265, 432 P.2d 953].) After the judgment he continued to treat the $790.30 as trust funds when he withdrew that exact amount from a trust account in the form of a cashier's check payable to himself as trustee, which check he eventually used to satisfy other creditors who, in his words, were more deserving to be paid.

■ The record demonstrates that petitioner was fully aware of his fiduciary duties to Silco with respect to its deposit, that he knowingly breached those duties, and that he wilfully appropriated to his own use $790.30 of the proceeds which he had been holding in trust. He has failed to meet the high standards demanded of members of the legal profession and should be disciplined therefor. The board's decision to publicly reprove him is amply warranted. This opinion shall serve as such reproval.