In the Matter of the Conduct of Stanley P. CORNELIUS, Attorney at Law, Respondent.

No. 1944.

Supreme Court of Alaska.

March 15, 1974.

Opinion on Rehearing April 22, 1974.
See 521 P.2d 497.

**78**

Roger M. Leed and Croil Anderson, Seattle, Wash., Terry C. Aglietti, Anchorage, for respondent.

Mary F. LaFollette, Anchorage, M. Gregory Papas, Juneau, for Alaska Bar Association.

Before RABINOWITZ, C. J., and CONNOR and FITZGERALD, JJ.

## OPINION

CONNOR, Justice.

This is a disciplinary proceeding against an attorney, Stanley P. Cornelius (hereinafter referred to as respondent). The trial committee of the Alaska Bar Association recommended, and such recommendations were adopted by the Board of Governors of the Bar Association, that respondent be suspended from the practice of law for up to 42 months. This suspension was recommended because the committee found against the respondent on four counts of a five-count complaint. The four counts which were proved charged that respondent, through his activities in a particular business venture, had violated several of the Alaska Bar Rules and the Canons of Professional Ethics. The major charges were that respondent had suborned litigation, solicited professional employment, and entered into a partnership between lawyers and non-lawyers where part of the employment consisted of the practice of law; and that respondent had wrongfully converted, to his own use and benefit, money entrusted to him and took advantage of the confidence reposed in him by his clients.[1] The facts underlying the complaint and subse-

---

1. Among the applicable provisions are Alaska Bar Rule I, § 1, (c), (f), (*l*), (n) and Canons of Professional Ethics (made applicable by former Alaska Bar Rule I, § 1 (p)) 11, 27, 28, 33.

quent disciplinary recommendation are complex and detailed, but an exposition of the main features is necessary in order to reveal the basis for the disciplinary action.

In 1969, respondent was in the employ of an Anchorage law firm which was retained to render an opinion concerning title to certain lands on the North Slope. To further this end, respondent was sent to Fairbanks to search the land records of the Bureau of Land Management (hereinafter referred to as BLM). In the course of this title search, he found that offers for noncompetitive oil and gas leases had been filed with the BLM covering various tracts of land lying partially within the exterior boundaries of the Arctic Wildlife Refuge, a federal land reserve. Since these lands were located in the vicinity of lands then being offered for lease by competitive bid by the state for oil exploration, they presented a possibility of great potential value. The attorney representing the offerors of the noncompetitive leases had developed a theory that since a number of prospecting permits, issued by the BLM, had been issued prior to the time the reserve was established, the tracts were legally excluded from the reserve. When the interests held under the prospecting permits were relinquished, the theory continued, without a subsequent appropriation by executive order for inclusion in the Wildlife Refuge, the land reverted to the public domain and was open to non-competitive oil and gas leasing under the Federal Mineral Leasing Act.

Following his search of the Fairbanks land records, respondent concluded that there were indeed tracts of unappropriated land within the boundaries of the Wildlife Refuge upon which no oil and gas lease offers were pending. However, his firm's client disclaimed any interest in pursuing this possibility. Respondent then returned several times to Fairbanks and discovered from the land records that a situation similar to that of the Wildlife Refuge also existed with regard to certain lands located within Naval Petroleum Reserve No. 4, on Alaska's North Slope. Upon obtaining information regarding prospecting permits in effect at the time of withdrawal of Reserve No. 4, respondent was able to obtain legal descriptions of at least 39 tracts of land located in Reserve No. 4, and 5 tracts located in the Wildlife Refuge. These tracts, he believed, were susceptible to his theory, that is, they were public lands open to non-competitive leasing because prospecting permits existed at the time of the Wildlife Refuge and Reserve No. 4 withdrawals; and when the permits were relinquished, the lands reverted to the public domain. It was likely however that it would probably be necessary to litigate the matter.

Respondent's discovery of tracts possibly open to noncompetitive oil and gas leasing led to the formation of Starling Brokers, a partnership which consisted of respondent, his father, Starling Cornelius, and Hillen L. Arnold. The partnership was organized to act as agents for clients in obtaining oil and gas leases on land located within Petroleum Reserve No. 4 and the Wildlife Refuge. The services offered by the partnership were to include the filing and perfecting of offers for leases utilizing respondent's theory and the information he had culled from the land records. The business was operated from respondent's law office (he had by now withdrawn from the law firm).

Potential offerors were solicited by Starling Brokers; representations were made that respondent was familiar with the procedures of obtaining oil and gas leases, and that potential sites had been located. It was also pointed out that litigation was a possibility, and respondent would pursue the case up through appellate levels.

For each lease offer, a potential investor-offeror was required to deposit $710 with Starling Brokers and $1,280 with the BLM as tender for the first year's rent; the deposit would be refunded by BLM if the lease was denied. Starling Brokers was also to receive 50% interest in each lease offer, in consideration for which it was to prepare the offers, use the $710 de-

posit for any expenses incurred in obtaining the leases including litigation through federal appellate levels, with respondent to act as attorney, and pay any additional expenses over and above the initial $710 deposit.

In September of 1969, a total of 46 offers to lease were filed through the agency of Starling Brokers, 7 of which were in the Wildlife Refuge and 39 in Reserve No. 4. Investors deposited $58,880 with BLM and $31,950 with Starling Brokers (one lease offeror was not an investor with the partnership). In October of 1969, it was discovered that a substantial majority of the offers filed on Reserve No. 4 could not be proven to correspond with prospecting permit descriptions and so would have to be withdrawn. When the BLM rejected each offer to lease, respondent sent the investor-offerors the decision and informed them that notices of appeal from the rejections had been filed. In December of 1969, respondent, representing himself as attorney for the offerors, withdrew the 39 offers to lease in Reserve No. 4 and requested refund of the advance rents, payable "to those who had remitted the various amounts" (a 30-day delay in obtaining refund checks was anticipated).

Because of the general interest in noncompetitive gas and oil leases on the North Slope at the time, Starling Brokers concluded that new oil and gas lease offers should be filed as soon as possible. In order to expedite the filing of a second set of lease offers before the refund from the BLM for the first set of offers was obtained, respondent arranged financing with members of a firm known as Viking Petroleum to obtain the sum of $49,920. The money was to be deposited with the BLM as advance rent on the second set of lease offers, and Viking Petroleum was to receive an interest in each lease, taken from respondent's interest through Starling Brokers. It was further agreed that if the lease offers were finally rejected, the refunds would go to Viking Petroleum; but if the leases were granted, respondent would personally be liable to Viking Petroleum for the $49,920. Using the advance rent payments obtained from Viking, 39 lease offers were filed in December of 1969; each offer represented respondent, Arnold and a Viking officer as the offerors and sole parties in interest. Neither Starling Cornelius nor any of the earlier investor-offerors signed the new lease applications nor did their names appear thereon. No statement of interest was filed with BLM disclosing any interest on the part of the original investors or the other members of the Viking group.

On January 5, 1970, the refund on the first (withdrawn) group of lease offers was made in checks payable not to the offerors but to the three partners of Starling Brokers. These checks were endorsed by the partners and deposited in the partnership checking account for total deposits of $47,360.[2] At the end of January, the investor-offerors were informed that their original lease offers were withdrawn but that they retained the same interest in the new lease offers. They were not informed that their names did not appear on the second set of lease offers as offerors or parties in interest.

The three partners of Starling Brokers, respondent, Arnold and Starling Cornelius, were also financially interested in and partners in Starling Construction Company, which operated from respondent's law offices, and in Starling Co., Inc. Respondent, Arnold and others were financially interested in and officers in Northland Homes, Inc., which ceased operations in September of 1970.

---

2. At this point, Viking Petroleum requested these refunds as their repayment. Respondent indicated that such was not the agreement; repayment was not required until the second set of leases was either rejected or granted. During this dispute over entitlement to the BLM refunds, respondent represented in a letter, "We feel that we are trustees of all this money, some of which or all of which may be used to further the interests of obtaining these leases."

· Between September 1969 and the end of December 1969, deposits in the Starling Brokers' account totaled $32,037.50, all but $87.50 attributable to money advanced by the investor-offerors. During that same period, $23,564.10 was disbursed from the account, leaving a balance of $8,478.40. The bulk of these disbursements, $17,318.-90, was made to or on behalf of Starling Construction Co., Starling Co., Inc., respondent or other parties of Starling Brokers for purposes unconnected with the oil and gas leases. From January 1970 to mid-July 1970, $59,407 was deposited in Starling Brokers' general account, all but $552 attributable to the refund from BLM ($47,360) and advances from a third filing ($11,495).[3] During this same period, disbursements from the account totaled $64,413.12, the bulk of which ($55,215) was disbursed to or on behalf of Starling Co., Inc., Northland Homes, Inc. or to partners of Starling Brokers.

The trial committee found that the course of action described above constituted violations of the Alaska Bar Rules and the Canons of Professional Ethics as charged in the first four counts of the complaint and recommended a 42-month suspension from practice. This petition for review of the matter comes before the court pursuant to Alaska Bar Rule I, § 13.

I.

The bulk of respondent's arguments center about claims that he was not accorded fairness in the proceedings which led to the recommendations for discipline. We will now turn to these assertions individually.

(a) Search and Seizure.

Respondent's law partner, Mr. Hancock, had become peripherally involved with the affairs of Starling Brokers, and he was concerned about his connection with the company. After consulting another attorney, he decided to consult with the state bar counsel, who suggested that certain records be reviewed for the purpose of evaluating the possibility of initiating a disciplinary action. Upon request Mr. Hancock turned the documents over to the bar counsel. Respondent contends that this transaction violated his right against unreasonable search and seizure under article I, § 14 of the state constitution and the fourth and fourteenth amendments to the federal constitution. We do not agree.

■ Mr. Hancock was a law partner with Mr. Cornelius, and as such, shared an office with him. The records of Starling Brokers were in the office, and Mr. Hancock was in charge of the office in respondent's absence. Under well-established doctrine, one who has joint access may effectively consent to a search, and any evidence thus disclosed may be used against the other.[4] We find no valid search and seizure claim.[5]

(b) Self-incrimination.

Respondent makes two claims that his constitutional right not to be a witness

3. A third set of 16 lease offers, unconnected with the first two sets was filed through the agency of Starling Brokers, in February of 1970, under an arrangement similar to that of the first filings; Starling Brokers would file and litigate the lease offers in return for an interest in the lease. Investors-offerors advanced $11,495 to Starling Brokers.

4. In Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), the court held that a joint user of a duffle bag had authority to consent to its search. In United States v. Eldridge, 302 F.2d 463 (4th Cir. 1962), it was held that the consent of a gratuitous bailee of an automobile made a search reasonable. United States v. Sferas, 210 F.2d 69 (7th Cir. 1954), held that a business partner may consent to a search of the business premises.

In United States v. Goodman, 190 F.Supp. 847 (D.C.1961), it was held that a law partner may consent to a search of the premises. Mc-Galliard v. State, 470 P.2d 275 (Alaska 1970), held that joint right-of-access with consent is sufficient to uphold a warrantless search by government officers; this was in the context of a consent by the owner of a vehicle who had right-of-access along with the shipper.

5. Since we find the consent necessary to remove a search from the realm of illegality, we do not reach the questions of whether the same search and seizure strictures applicable in a traditional criminal proceeding extend to disciplinary bar proceedings and whether the Bar Association can be equated with the police officers involved in the searches in those criminal proceedings.

against himself[6] was violated. He asserts that the removal and use of the documents discussed, supra, and the use before the trial committee of testimony adduced before the investigating committee was violative of the privilege.[7] Again, we cannot agree, as neither of the claimed violations falls within the scope of the privilege.

■ The privilege does not obtain in the case of the documents because "the ingredient of personal compulsion" is lacking.[8] The privilege against self-incrimination is a personal one; although the accused is protected from compulsion to incriminate himself, the constitutional provisions do not proscribe incriminating statements elicted from another.[9] Where, as here, respondent left the documents in the custody of his partner, Mr. Hancock, who voluntarily turned them over to the Bar Association, there can be no application of the privilege.[10]

■ The introduction of excerpts of respondent's testimony before the investigating committee at the trial committee is equally lacking in the necessary element of compulsion. Respondent had voluntarily testified before the investigating committee; there is no constitutional barrier to the introduction of this testimony at a second hearing.[11] There was no violation of any privilege respondent may have possessed.

(c) Right to Counsel.

■ Respondent argues that the committee's choice of hearing dates forced his counsel to withdraw, and the committee afforded him inadequate opportunity to obtain new counsel. Both of these actions, he claims, deprived him of his right to have counsel as provided by Alaska Bar Rule I, § 7. But an examination of the record reveals that such was not the case. It is evident that the trial committee and respondent's counsel had difficulty in agreeing upon a hearing date. After a substantial period of delay because of this problem (initial hearings were closed in October 1971), the hearing was scheduled to begin in August of 1972. Respondent's counsel then moved to withdraw. This motion was denied as was a later motion for reconsideration. When respondent's counsel failed to appear at the August 8, 1973, hearing, respondent was granted a continuance in order to allow him to contact his counsel or to obtain new representation. His counsel informed him that he would not continue to represent respondent; counsel was then removed by the committee, and respondent was granted several more continuances until October 30

---

6. U.S.Const. amend. V: "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." Alaska Const. Art. I, § 9: "No person shall be compelled in any criminal proceeding to be a witness against himself." Although the words of the phrases indicate that the privilege obtains only in criminal proceedings, it has been held that the privilege is not ordinarily dependent upon the nature of the proceeding. McCarthy v. Arndstein, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924).

7. Since we do not find the situations in question to be covered by the privilege, we will not consider the effect of certain statements of respondent as to waiver of the privilege, made at preliminary proceedings and affirmed before the trial committee.

8. Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548, 554 (1973).

9. Couch v. United States, 409 U.S. 332, 93 S.Ct. 611, 34 L.Ed.2d 548, 554 (1973); John-

son v. United States, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910). Cf. McConkey v. State, 504 P.2d 823 (Alaska 1972), concurring opinion of Erwin, J.

10. Cf. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) which held that the government may retain for use against their owner incriminating documents which were stolen by private individuals.

11. United States v. Kordel, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970); State v. Griffin, 242 Or. 284, 409 P.2d 326 (1965). By applying the doctrine of these cases, we do not mean to imply that we have determined whether the proceedings before the investigating and trial committees are separate and distinct so as to entitle respondent to assert his privilege at the second hearing. See In re Neff, 206 F.2d 149 (3rd Cir. 1953).

to allow him to obtain new counsel. When the hearing resumed, respondent was again without counsel, and his testimony indicated that he had made no more than a token effort to obtain representation. His motion for a continuance was denied.

Under these circumstances, we cannot say that respondent was denied counsel,[12] except perhaps through his own failure to provide the same.

(d) Right to Jury Trial.

Respondent claims that he is entitled to a jury trial. His thesis is that this proceeding is tantamount to a criminal prosecution. Under Baker v. City of Fairbanks, 471 P.2d 386 (Alaska 1970), in which we expanded the right to jury trial, he asks that we make that institution applicable to Bar disciplinary proceedings.

Respondent ignores the portion of the *Baker* opinion in which we specifically excluded from the right to jury trial the very kind of proceeding in which respondent is now enmeshed:

> This does not cover revocation of licenses pursuant to administrative proceedings where lawful criteria other than criminality are a proper concern in protecting public welfare and safety, as the basis of revocation or suspension in such instances is not that one has committed a criminal offense, but that the individual is not fit to be licensed, apart from considerations of only guilt or innocence of crime. 471 P.2d, at 402 n. 28.

Nothing in respondent's brief persuades us that Bar disciplinary proceedings should be tried by jury, either as a matter of constitutional law or as sound procedure. We will not consider the point further.

(e) Due Process.

Respondent presents several due process claims. He first alleges that the trial committee's failure to supply a certified copy of the transcript of the investigating committee hearing deprived him of due process of law. An examination of the records reveals that respondent was given ample opportunity to obtain a transcription of the hearing.[13] The hearing was recorded, and respondent was informed of the probable cost of transcription of the record. He was also furnished with a complete set of duplicate tapes of the proceedings. His attorney later reported that he had lost the tapes, and respondent did not request another set of tapes or renew his request for a transcript. Respondent was not deprived of any due process rights since he had opportunity to obtain a transcript if he so desired.

Respondent further alleges that his right to due process of law and that AS 44.62.630, which provides that hearing officers be impartial, were violated by the role taken by the trial committee. He asserts that the committee took an active adversary role. Again, the facts belie this contention. The committee questioned witnesses and at one point indicated that, if it felt the need, it would call independent witnesses. The trial committee was well within its rights in questioning the witnesses, and it may call independent witnesses if it so desires. Cooper, State Administrative Law, Vol. I, p. 336 (1965); N.L.R.B. v. Baldwin L. Works, 128 F.2d 39 (3rd Cir. 1942). Respondent has not shown that the committee's questioning demonstrated any predisposition to find against him or that it otherwise interfered with the orderly presentation of the evidence. We find no deprivation of due process rights with regard to the role of the trial committee.

There is also no merit to the claim that the combination of functions of the state bar attorney, alleged to be that of complainant, prosecutor and adjudicator,

---

12. *Cf.* Klockenbrink v. State, 472 P.2d 958 (Alaska 1970).

13. There is no rule requiring a record of investigating committee proceedings, and failure to keep such record for purposes of impeachment does not result in denial of due process. Respondent has not persuaded us that he suffered injury as the result of not receiving a copy of the transcript. Robinson v. State, 489 P.2d 1271 (Alaska 1971); Robinson v. State, 487 P.2d 681 (Alaska 1971).

violated due process or AS 44.62.630. The combination of investigative and judicial functions within an agency does not violate due process; a board may make preliminary factual inquiry on its own in order to determine if charges should be filed. Pangburn v. C.A.B., 311 F.2d 349 (1st Cir. 1962); Lehigh Portland Cement Co. v. F. T.C., 291 F.Supp. 628 (E.D.Va.1968). And, minimum requirements of procedural due process are not offended by the attorney for the agency acting as advisor on procedural matters. Austin v. Maxwell, 456 F.2d 1237 (5th Cir. 1972).

Alaska Bar Rule I, §§ 3 and 4, provides that the preliminary determination to hold a hearing in a disciplinary matter is to be made by the president with the investigative assistance and recommendations of the bar counsel. And under Alaska Bar Rule I, §§ 4 and 5, the president is empowered to appoint committees and remove members from committees. An examination of the record shows that appointments were made by bar presidents in this case. Respondent has made no showing that the bar counsel exercised any type of control over the committees, or that the decisions in this matter were not properly made on the basis of the evidence adduced at hearing.[14] There has been no deprivation of due process rights in this regard.

 Finally, respondent contends that Alaska Bar Rule I, § 25 provides an unconstitutional standard for review. The rule provides in pertinent part:

Process and procedure under this rule shall be as summary as may be reasonable. No investigation or proceedings hereunder shall be held invalid by reason of any nonprejudicial irregularity, nor for any error not resulting in a miscarriage of justice.

This rule is essentially the same as that of Criminal Rule 47(a): "Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."[15] This rule is applied in all criminal trials in Alaska where any error found is not of constitutional dimension. We find that this standard of review is also appropriate for review of bar proceedings where no error of constitutional dimension is found, as is the case here.

(f) Hearing De Novo.

Respondent claims entitlement to a hearing de novo before a court rather than a trial committee of the Alaska Bar Association. Most of his claim is premised on the assertion that the procedure employed by the Alaska Bar Association was so unfair that only by a trial in court can his rights be vindicated. Respondent's procedural claims have already been disposed of unfavorably to his contentions. We have no reason, therefore, to consider further any exercise of our discretion to grant a hearing de novo, either in whole or in part.

II.

Respondent's second and last material claim is that the conclusions of the trial committee adopted by the Board of Governors are insufficient in law and in fact. Proof of four of the five counts in the complaint was found, and the recommendations included separate periods of suspension, to run concurrently, for each count found to be proven.

Count one charged respondent with the solicitation of professional employment, the acceptance of employment solicitated by others, the formation of partnerships between lawyers and non-lawyers where the partnership provides, in part, legal services, and the bringing of reproach upon the profession through such actions.[16]

---

14. Respondent also contends that a delay in the filing of an informal complaint was prejudicial. But he neglects to point out in what fashion if any he was harmed. Without more, this issue will not be considered. Wright v. State, 501 P.2d 1360 (Alaska 1972).

15. An analysis of the harmless error rule and its application is found in Love v. State, 457 P.2d 622 (Alaska 1969).

16. Alaska Bar Rule I, § 1(l), Canons of Professional Ethics, 27, 28, 33.

■ Professional services performed by one licensed to practice law must conform to the standards of the profession, regardless of the capacity in which an attorney may be acting. Librarian v. State Bar, 21 Cal.2d 862, 136 P.2d 321 (1943). Respondent will be held to the standards of his profession if his activities in Starling Brokers were so legal related as to be a part of the practice of law.[17]

■ Mr. Cornelius was engaged in this law-related business with non-lawyers, and thus a violation of Canon 33 was found. It was also found that in the course of the business, respondent had solicited at least one offeror and had accepted the business of other offerors solicited by his partners,[18] and that he had participated in the organization of prospective litigants, thus creating litigation.[19] In In re L.R., 7 N.J. 390, 81 A.2d 725 (1951), an attorney participating in a realty corporation which offered its customers the inducement of an owner who could handle all legal work was found to be in violation of Canons 27 and 28. The conclusions of the Board on count one are sufficient in law, and the record reveals, also in fact.

Counts two and three charge respondent with the wrongful conversion to his own use and benefit of monies entrusted to him when acting as an attorney and agent for the owners of the money.[20] Count two deals with the BLM refunds which were not refunded by Starling Brokers to the offerors as had been originally requested

by the partners; count three concerns the monies paid into the company's account by the offerors to meet the costs of obtaining the oil and gas leases including litigation. As was noted in the exposition of facts in this case, these funds were depleted, with much of the money flowing into respondent's other business ventures.

■ The Board found that Starling Brokers received the refunds as agent for the offerors based on the parties' prior relationship and the fact that the refunds were requested in offerors' names. Generally, an agent who receives money for his principal receives as an agent-trustee.[21] An attorney who receives money on behalf of another is a fiduciary in the absence of an agreement to the contrary; the funds are impressed with a trust and conversion by the attorney is a breach of that trust.[22] The Board found that the refunds were disbursed with respondent's knowledge and participation, and that the substitution of the Viking Petroleum funds was not sufficient to rectify the situation since the original offerors had no interest in the new lease applications. The Board's findings and conclusions are consonant with law and with the record.

■ The Board adopted the findings of the trial committee as to count three, that the $710 per oil and gas lease application paid to Starling Brokers was for the purpose of paying the expenses incurred in connection with obtaining oil and

---

17. See ABA, Opinion of Comm. of Prof. Ethics and Grievances, No. 57 (1932).

18. In re Randolph, 347 S.W.2d 91 (Mo.1961), cert. den., 368 U.S. 916, 82 S.Ct. 196, 7 L.Ed.2d 132 (1961) holds that an attorney may be disbarred for soliciting and accepting business solicited by others.

19. The test in this situation appears to be whether the nature of the business and the lawyer's relation to it are so designed as to be likely to result in his professional employment. See In re Rothman, 12 N.J. 528, 97 A.2d 621, pp. 635–638 (1953).

20. Alaska Bar Rule I, § 1(f), (l), (p), Canons of Professional Ethics 11.

21. Restatement, Trusts § 12(h) at 38–9 (1959). The example used by the Restatement is that of an attorney who receives money for his client to be applied for his client's purposes.

22. Crooks v. State Bar, 3 Cal.3d 346, 90 Cal.Rptr. 600, 475 P.2d 872 (1970); Johnstone v. State Bar, 64 Cal.2d 153, 49 Cal. Rptr. 97, 410 P.2d 617 (1966); Clark v. State Bar, 39 Cal.2d 161, 246 P.2d 1 (1952). It has also been held that an attorney may be disbarred if trust monies held by him are appropriated to his own use. Cutler v. State Bar, 71 Cal.2d 241, 78 Cal.Rptr. 172, 455 P.2d 108 (1969); People ex rel Colo. Bar Assn. v. Betts, 26 Colo. 521, 58 P. 1091 (1899).

gas leases. This was based on representations made to offerors concerning the strong possibility of extensive litigation and the concomitant substantial legal fees, and the fact that Starling Brokers also received a 50% interest in each lease application. Failure to apply money received to the purposes for which it was remitted and instead, diverting it to the attorney's use is a violation of fiduciary duty.[23] Such an action can constitute conversion.[24] The record shows that findings of a fiduciary duty on the part of respondent with regard to the money and a knowing disbursement of those monies for purposes other than those intended by the offerors are justified.

■ Count four charges respondent with the abuse of the confidence reposed in him, through the use of certain letters sent to the original offerors which informed them that they retained an interest in the lease applications even while respondent knew the original offerors were not named as offerors or interested parties in any lease applications.[25] This court has held that an attorney has a duty to exercise the utmost integrity in dealing with a client, and business dealings between an attorney and his client are subject to close scrutiny by the courts.[26] Since respondent was often acting in the capacity of attorney to Starling Brokers and its offerors, the Board was justified in holding him to the standards of the profession.

We find that respondent was proceeded against properly under the standards expressed in the Canons, the applicable rules governing behavior at the time of the conduct in question, and the findings and conclusions are adequate both in law and in fact.

### III.

We are impressed with the thoroughness and apparent reflectiveness with which this case was processed by the Alaska Bar Association. We think that the recommended penalties represent the considered judgment of those whose task it was to participate in the earlier stages of this proceeding. Respondent does not argue that the recommended penalties are too harsh. In fact, he remains silent on that point.

After considering the amount of discipline which should be exerted against respondent, we have determined to accept the recommendation of the Alaska Bar Association. Accordingly, an order shall be entered suspending respondent from the practice of law for the following periods which have been recommended by the Bar, as related to the four counts which have been established against him: Counts one and two, four months' suspension each; counts three and four, forty-two months' suspension each. The periods of suspension shall run concurrently. Before respondent is eligible for reinstatement, he shall satisfy the following condition, in addition to those set forth in Alaska Bar Rule I, § 16: Any petition for reinstatement shall set forth, and it shall be established before any trial committee which shall be appointed, that respondent has made full restitution to any person as to whom restitution may be owing as a result of the misconduct for which respondent was suspended.

ERWIN, and BOOCHEVER, JJ., not participating.

---

23. Colo. Bar Assn. v. Logan, 130 Colo. 54, 272 P.2d 993 (1954).

24. Himmel v. State Bar, 4 Cal.3d 786, 94 Cal.Rptr. 825, 484 P.2d 993 (1971).

25. Alaska Bar Rule I, § 1(c), (*l*), (p), Canons of Professional Ethics 11.

26. Palfy v. Rice, 473 P.2d 606 (Alaska 1970).